**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WILLIAM A. BRANDT, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06 C 588 |
| | ) | |
| VILLAGE OF WINNETKA, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This case presents the challenging question of whether a municipality violates the Constitution when it attempts to collect from its residents the costs imposed on the municipality by the residents' First Amendment exercise. Plaintiff here challenges an Ordinance adopted by the Village of Winnetka for that purpose and seeks summary judgment on its facial challenge to the Ordinance's validity. Winnetka has moved to dismiss Plaintiff's complaint for lack of standing and on the merits. For the reasons explained here, both motions are denied.

**BACKGROUND**

William A. Brandt, Jr. ("Plaintiff") is one of the nation's foremost political fundraisers. For decades, Plaintiff has hosted fundraisers for prominent politicians and political candidates in his Winnetka, Illinois home, a practice that Plaintiff plans to continue into the future. As a resident of the Village of Winnetka, Plaintiff is subject to the Winnetka Village Code. Pursuant to Chapter 5.66 of that Code ("the Ordinance"), an individual or organization who requests or requires the use of Village personnel, equipment, or property in connection with an event taking place in the Village of Winnetka may be required to compensate the Village for those services and equipment. Plaintiff now challenges the Ordinance as a violation of the First Amendment of the United States Constitution.

Plaintiff filed his First Amended Complaint in this action on February 28, 2006 and moved for summary judgment less than a month later. On March 30, 2006, Defendant filed a motion to

dismiss. In large part, Defendant's arguments for dismissal have been incorporated into Defendant's response to Plaintiff's motion for summary judgment. In this opinion, the court decides Defendant's motion to dismiss, Plaintiff's motion for summary judgment, and Defendant's motion to strike portions of Plaintiff's evidentiary submissions.

## CHAPTER 5.66 OF THE WINNETKA VILLAGE CODE

On November 9, 2000, the Winnetka Village Council passed Ordinance MC-04-2000, adding Chapter 5.66 entitled "Special Event Permits and Fees" to the Winnetka Village Code. WINNETKA VILL. CODE § 5.66 (2006) (Ex. N to Pl. LR 56.1 Stmt.). On February 21, 2006, the Winnetka Village Council amended Chapter 5.66 "in an effort to clarify the intent of the Village to impose a content neutral policy for being compensated when an individual or organization hosts or sponsors an event that requires the Village to provide special services." *Id.* § Preamble. The provisions of Chapter 5.66 that are most relevant to this dispute are set forth below; the full text of the Ordinance is attached to this opinion as an appendix.

The current Ordinance—the one at issue in this lawsuit—declares the Village's policy that an individual who "holds or sponsors an event that requires the Village to provide special services" should pay the costs to the Village for providing those services. *Id.* § 5.66.010. A "special service" is "the allocation of Village personnel, equipment, rights-of-way or property for use in conjunction with a special event." *Id.* § 5.66.020(B).[1] A "special event" is defined as an activity that occurs on public or private property that is not sponsored in any part by the Village and requires the Village to provide special services. *Id.* § 5.66.020(A). The Ordinance is explicit as to those events that are not "special events" and therefore do not fall under the Ordinance: "official" visits or appearances

---

[1]  The Ordinance provides a non-exhaustive list of examples of "special services," including: "street closures; requiring police officers to stop or reroute traffic; special police protection; stationing emergency vehicles at or in the immediate vicinity of the event; street cleaning; garbage removal; special signage, such as temporary no parking signs; and the use of any Village building, equipment, or other property for any purpose other than the normal daily operations of the Village." WINNETKA VILL. CODE § 5.66.020(B).

by certain high level government officials; events sponsored by certain local public entities (e.g., public schools, park district, public library); events occurring outside the corporate limits of the Village where services are provided pursuant to a mutual aid agreement or other practice of intergovernmental cooperation; or annual, community-wide events that "[serve] the residents or businesses of the Village, that [are] open to the general public without charge, and that [require] the use of public streets, sidewalks or open spaces subject to approval by the Village Council." *Id.* § 5.66.020(D).

Under the Ordinance, no person or organization is allowed to conduct a "special event" without first obtaining a special event permit from the Village. *Id.* § 5.66.030. All applications for special event permits must be made to the Chief of Police at least fifteen days before the proposed special event. *Id.* § 5.66.040(A). In addition to describing the Village services required and the restrictions the applicant is requesting on public rights-of-ways or private streets, the application must "describe the special event," including its location and duration, and must furnish further information that the Village deems necessary "to determine the nature and extent of municipal services to be provided." *Id.* § 5.66.040(B). The Chief of Police distributes the application to various Village officials who estimate the services, personnel, and equipment within their purview that are required for the special event. *Id.* § 5.66.040(C). A fee to be charged for the required services, personnel, and equipment—the "user fee"—is then determined by the Chief of Police based on fee formulas set forth in the Ordinance. *Id.* § 5.66.040(C).

Section 5.66.050 describes how the Chief of Police is to determine the cost for the use of the Village's personnel, equipment, and property, and authorizes the Village to provide additional services as it deems necessary. *Id.* § 5.66.050. The cost of Village personnel is established by the Village Manager based on the salaries that correspond to the job classifications of the Village employees who are to provide services for the event. *Id.* § 5.66.050(A). The cost for the use of Village equipment is equal "to the applicable hourly rate established by the Village Manager for

each piece of Village equipment assigned."  *Id.* § 5.66.050(B).  The Ordinance also sets forth specific fees for the use of Village property or rights-of-way, including the use of public buildings ($500 or $1,000 per day depending on whether the building is a public safety or public works building and whether it is used during or outside of business hours), total closure of a public street in any part ($50 per hour), and partial closure of a public street ($25 per hour).  *Id.* § 5.66.050(C). The "user fee" is the total of the amount calculated pursuant to § 5.66.050 plus a ten percent non-refundable administrative fee; if the user fee paid exceeds the eventual cost of services, the excess, except for the administrative fee, is refunded.  *Id.* §§ 5.66.040(C), (F).[2]

The user fee must be paid in full prior to the special event unless the application was submitted less than fifteen days before the special event; in that case, ten percent of the user fee must be deposited in cash before the event, and the total user fee is calculated after the event.  *Id.* § 5.66.040(D).  After the event, a supplemental user fee plus a ten percent administrative fee may be required for any additional services that were provided in connection with the special event.  *Id.* § 5.66.040(E).  The Ordinance further declares that the failure to provide adequate notice of a special event "interferes with the normal operations of the Village and jeopardizes the Village's ability to provide for the public safety"; accordingly, any person who holds or sponsors a special event without submitting the required complete application and deposit at least five days before the event must pay a late payment fee that equals the total of the user fee and supplemental user fee; this late fee is in addition to paying the initial user fee and supplemental user fee.  *Id.* § 5.66.040(F).

Under the Ordinance, the Village reserves the right to deny a permit for the following reasons:

---

[2]      Those applying to hold a special event must pay a non-refundable application processing fee of $35 that is credited against the user fee.  *Id.* § 5.66.040(C).  Those who do not submit their application at least fifteen days before the event must pay a non-refundable late fee of $250 in addition to the application processing fee, but this $250 is not credited against the user fee.  *Id.*

- if the application is incomplete, contains false information, or does not comply with the Ordinance;
- if the special event is for an illegal activity;
- if the person applying for the permit has a balance from a prior special event;
- if "the event will substantially or unnecessarily interfere with traffic in the Village, will interfere with access to the fire station or fire hydrants, or will interfere with access to businesses or residences in the immediate vicinity of the event and . . . there are not available at the time of the proposed event sufficient Village resources to mitigate the disruption"; or
- if "the special services required for the event will substantially or unnecessarily interfere with the police, fire, water, electric, public works or other services to the Village as a whole and . . . there are not available at the time of the proposed event sufficient resources to mitigate the disruption."

*Id.* §§ 5.66.040(J)(1)-(2), (5)-(7). The Ordinance also authorizes the Village to order the special event to cease if the Village Manager determines that terms of the permit have been violated, or if "the special event is creating a public nuisance or hazardous condition, provided that the event is allowed to resume upon the abatement of the nuisance or hazardous condition." *Id.* § 5.66.040(J)(4). Further, the Village may impose additional requirements, conditions, or restrictions on the special event if these requirements are "necessary to protect the public health, safety, or welfare." *Id.* § 5.66.040(J)(8).

In the Ordinance, the Village reserves the right to modify or waive the requirements for a special event if the Village Manager finds that it is (i) open to the general public, "(ii) sponsored by an organization that is located in and serves the residents or business of the Village . . ., and (iii) that the event will encourage the economic development of the Village, provide safe activities for the children . . ., promote citizen involvement or otherwise benefit the health, safety or welfare of the Village and its citizens." *Id.* § 5.66.040(J)(9). The Village Manager also has the authority to waive certain requirements and reduce or waive fees in instances where the services required are minimal, for example, where the amount of the administrative fee would be so low that it would not cover the cost of processing the application. *See id.* § 5.66.040(K).

Finally, the Ordinance provides that an applicant may appeal the Village Manager's decision to deny or revoke a permit to the Village Council. *Id.* § 5.66.040(L). An applicant may also appeal

5

the amount of the user fee or supplemental user fee to the Village Council. *Id.* To facilitate the appeal, the applicant must notify the Village Manager within seven days after the decision being challenged, and the Village Manager will set the appeal for the next regularly scheduled Village Council meeting. *Id.*

Plaintiff contends here that the Ordinance discriminates based on viewpoint because the permit system considers factors such as the disruption or interference with Village services or traffic flow; this, according to Plaintiff, requires the Village to assess the audience's reaction to the speech and, therefore, the content of the speech. (Pl. Mot. for SJ at 7-9.) Plaintiff also views the Ordinance as an improper regulation of the time, place, and manner of speech, and contends that in addition to discriminating based on content, the Ordinance violates the Constitution because it is not narrowly tailored to serve a significant government interest, and does not leave open ample alternative channels of communication. (*Id.* at 9.) Further, Plaintiff contends that the Ordinance gives Village administrators too much discretion in granting permits, waiving permit requirements, determining the amount of Village services necessary, and determining the cost of Village services, and, Plaintiff argues, the Ordinance impermissibly restricts private First Amendment activity. (*Id.* at 11-14.)

## DEFENDANT'S MOTION TO STRIKE

Before addressing the parties' substantive arguments, the court considers Defendant's challenges to Plaintiff's submissions in support of his motion for summary judgment. Defendant vigorously and repeatedly contests the sufficiency of Plaintiff's LR 56.1 Statement of undisputed facts and moves to strike nearly Plaintiff's entire LR 56.1 Statement on the basis that the evidence Plaintiff offers in support of the statements is inadmissible. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) (confirming that LR 56.1 statements must be supported by "admissible evidence"). While the court declines to address Defendant's numerous objections to every statement of fact

specifically, the court will briefly address the categories of facts that Defendant moves to strike.[3]

A.    **Plaintiff's Statements About Security at Fundraising Events**

Plaintiff has submitted an affidavit to support his LR 56.1 Statement of Facts.  (Declaration of William A Brandt, Jr., Ex. A to Pl. LR 56.1 Stmt.) (hereinafter "Pl. Aff.")  Defendant contends that paragraphs eight through twenty of Plaintiff's affidavit, which relate to the nature of the security arrangements and Village services that may be necessary at political fundraising events, are either inadmissible hearsay or speculative.  (Def. Mot. to Strike ¶ 5; Def. Opp'n to SJ at 2-3.)  Defendant argues that Plaintiff has no firsthand knowledge of the security arrangements required at certain events, the security arrangements that have been required at events in his home, or how security personnel develop strategies regarding "event security."  (Def. Opp'n to SJ at 2.)  Plaintiff insists that he does have firsthand knowledge of the "general nature of the interaction between" politicians' security details and municipalities as a result of having hosted events at his home, worked with the security staffs for various public figures, and conducted advance work for other events.  (Pl. SJ Reply at 3.)[4]

While Defendant is correct that Plaintiff admitted that he does not get directly involved with security matters for events in his home and leaves such matters to security staff, (Pl. Dep. at 23, Ex. 13 to Def. LR 56.1 Resp.), the court does not read this admission to mean that Plaintiff has not observed or lacks knowledge of security practices.  Plaintiff's testimony that he is accustomed to

---

[3]    Plaintiff urges that the court should strike much of Defendant's own LR 56.1 Statement because, in Plaintiff's view, Defendant's dense and compound statements of fact evade the forty-paragraph limit imposed by Local Rule 56.1(b).  (Pl. SJ Reply at 5.)  Given Plaintiff's own failure to adhere to the Local Rules by submitting a single-spaced brief in reply to Defendant's opposition to summary judgment in violation of Local Rule 5.2(b), the court declines to penalize either party on these technical grounds.

[4]    According to Plaintiff, a politician's security "detail" may be provided by various organizations, depending on his or her office and security needs.  (*See* Pl. Dep. at 22, Ex. 13 to Def. LR 56.1 Resp.)  These organizations include the Secret Service, the Capitol Police—responsible for protecting members of Congress—and the State Police.  (Pl. SJ Reply at 3; U.S. Capitol Police, http://www.uscapitolpolice.gov/home.php.)

working with security details and has hosted approximately thirty or forty fundraisers in his Winnetka home in the last ten years, (Pl. Dep. at 9, 12, 17), is sufficient to establish that Plaintiff is knowledgeable about security requirements at political fundraisers. *See* FED. R. EVID. 602 (evidence must support that witness has personal knowledge of matter on which he testifies); FED. R. EVID. 701 (witness can testify to opinions or inferences that are "rationally based on the perception of the witness").

To the extent Plaintiff's general statements about the special services and security required at political events are admissible, Defendant urges, they are irrelevant to the constitutionality of the Ordinance. (Def. Mot. to Strike ¶ 9; Pl. LR 56.1 Stmt. ¶¶ 10-16.)[5] The court disagrees and finds such facts helpful to aid the court's understanding of the various ways the Ordinance may apply. It is true that Plaintiff brings a facial challenge to the Ordinance and is not challenging the Ordinance as it applies to a particular set of facts. But information about how an ordinance might apply is nevertheless relevant to a facial challenge. In evaluating a facial challenge, the court is called upon to consider how the governmental body that passed an ordinance constructs, implements, and interprets the ordinance. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992). An understanding of when the need for special services and security might arise is useful background for the court in making such determinations.

With respect to those portions of Plaintiff's affidavit based only on information he has "been

_____

[5]     Defendant also moves to strike many of the statements of fact regarding security needs at political events, specifically paragraphs twelve through sixteen of Plaintiff's LR 56.1 Statement, on the grounds that they are speculative. (Def. Mot. to Strike ¶ 10.) The court does not view statements about what security needs can arise at large political events as speculative. Defendant likewise moves to strike, as speculative, Plaintiff's statements about his expectations that he will host certain candidates for events in the future and that such events will require permits under the Ordinance. (*Id.*) Such facts are relevant to Plaintiff's standing and the court will consider them with the appropriate weight for that narrow purpose. The court is not persuaded by Defendant's argument that paragraphs nineteen and twenty-one of Plaintiff's LR 56.1 Statement are speculative, but the court strikes these paragraphs elsewhere on other grounds. (*See infra* Motion to Strike, Sections B & C.)

told" by the Secret Service or others, the court agrees with Defendant that such statements are hearsay. *See* FED. R. EVID. 802. From Plaintiff's testimony, however, it appears that in the instances where he claims to have "been told" of certain security practices, he has also observed the practices in the context of events he has hosted or attended so as to establish his firsthand knowledge. For example, Plaintiff stated in his affidavit that he was told that when the Secret Service is accompanying an officer to an event, the security officials will often change their requests for municipal resources before an event for security reasons. (Pl. Aff. ¶ 17.) But Plaintiff also testified that such statements by the Secret Service only confirmed "what [he] already knew." (Pl. Dep. at 43.) In 1996, Plaintiff observed that the Secret Service changed President Clinton's travel plans at the last minute; the President was expected to arrive by motorcade and ended up arriving by helicopter. (*Id.* at 40.) Defendant further points to particular statements in Plaintiff's affidavit (paragraphs eight, nine, and fifteen) and claims that Plaintiff admits that he does not have firsthand knowledge to support these statements. As to each of these paragraphs, the court finds that Plaintiff testified to general observations and awareness sufficient to support his statements, or, to the extent his knowledge comes from conversations with Winnetka policemen, the statements are not hearsay as they would qualify as statements by agents of a party-opponent, the Village of Winnetka, concerning a matter within the scope of the employment relationship. *See* FED. R. EVID. 801(d)(2)(D).

### B.    Newspaper Accounts

Defendant also moves to strike, on hearsay and relevance grounds, Plaintiff's Exhibits D through K, a series of newspaper articles relating to the attempts of other municipalities to recover costs for municipal services from political campaigns, and statements of fact based on those exhibits. (Def. Mot. to Strike ¶ 6; Def. Opp'n to SJ at 3.) Plaintiff responds only that the accounts were used for descriptive purposes and that Plaintiff does not rely on these accounts in moving for summary judgment. The court agrees with Defendant. The attempts of other municipalities to

enforce ordinances that may or may not be substantially similar to the Ordinance challenged here are not relevant to this court's analysis. *See* FED. R. EVID. 401; *U.S. v. Ahangaran*, 988 F.2d 521, 525 (7th Cir. 1993) (citations omitted) (stating that the court has broad discretion in determining the scope of relevant evidence). Moreover, to the extent they are offered for their truth, the articles are inadmissible hearsay and insufficient as the foundation for any statements of fact. FED. R. EVID. 801, 802; *see Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (finding a newspaper article to be inadmissible hearsay and confirming that hearsay evidence is inadmissible at the summary judgment stage in the same way it is inadmissible at trial). Paragraphs twenty through thirty-four of Plaintiff's LR 56.1 Statement are stricken.

### C.     Information Pertaining to the 2000 Ordinance

The Village first enacted an ordinance pertaining to special events in 2000 as Chapter 5.66 of the Winnetka Village Code ("the 2000 Ordinance"). In February of 2006, after the filing of this lawsuit, this ordinance was amended and became Ordinance MC-1-2006. Plaintiff then amended his complaint to address the amended Ordinance, which is the version he now challenges. (*See* 2/28/06 First Am. Compl.) Defendant moves to strike exhibits, statements of fact, and references in Plaintiff's motion for summary judgment that are related to the 2000 Ordinance primarily on the ground that they are irrelevant. (Def. Mot. to Strike ¶ 7; Def. Opp'n to SJ at 3-4.) Plaintiff argues that the prior version of the Ordinance and its legislative history are relevant to the purpose behind the existing Ordinance, Plaintiff's claim that the Ordinance is not content-neutral, and the Village's likely enforcement practices. (Pl. Reply to Mot. to Strike at 4; Pl. SJ Reply at 4.)

Statements of fact that enable the court to understand when the Ordinance currently being challenged was passed are relevant to this action for background purposes. (*See* Pl. LR 56.1 Stmt. ¶ 48.) Statements of fact that quote the original ordinance or compare the original ordinance to the amended version are not useful, however. Citing *MacDonald v. City of Chicago*, 243 F.3d 1021, 1025 (7th Cir. 2001), Defendant urges that where an ordinance is amended after suit is filed, the

10

amendment renders the prior ordinance moot such that the court will only review the current ordinance. (Def. Opp'n to SJ at 4.) In *MacDonald*, the Chicago ordinance related to permits for parades was amended after a lawsuit was filed; the Seventh Circuit declined to assess the constitutionality of the original ordinance because that ordinance had been mooted by the amended one. *See* 243 F.3d at 1025. As Plaintiff observes, the *MacDonald* court only considered whether the constitutionality of the original ordinance was at issue, and did not consider whether the original ordinance was admissible evidence when deciding the constitutionality of the amended ordinance. *See id.* This court is nevertheless unwilling to consult the language of the original ordinance as evidence of the purpose or likely enforcement practices for the amended Ordinance.

If, as Plaintiff argues, the language of the 2000 Ordinance evinces an intent to regulate the content of speech, that language only relates to the intent of the 2000 Ordinance. Indeed, the fact that the Village amended the 2000 Ordinance could be read to signify a change in intent or a realization by the Defendant that the language of the 2000 Ordinance did not reflect its actual purpose. Accordingly, the court finds that the language of the 2000 Ordinance is not relevant to the constitutionality of the amended Ordinance and strikes Plaintiff's statements of fact that relate solely to the language of the 2000 Ordinance. (Pl. LR 56.1 Stmt. ¶¶ 35-42; Exs. L & M to Pl. LR 56.1 Stmt.)

The language of the amended Ordinance that the Plaintiff now challenges is, of course, most relevant. The court agrees with Defendant, however, that the Ordinance speaks for itself and Plaintiff's recitation or paraphrasing of the Ordinance in his LR 56.1 Statement is not necessary to inform the court of the contents of the Ordinance, which has otherwise been submitted to the court in its entirety. The court will consider Plaintiff's arguments based on his interpretation of the Ordinance or its omissions, but those paragraphs of Plaintiff's LR 56.1 Statement that solely quote or paraphrase the Ordinance or note its omissions are stricken, and the court and will instead refer to the text of the Ordinance as necessary. (*See* Pl. LR 56.1 Stmt. ¶¶ 38, 43-47, 49-61.)

To illustrate the impact of the Ordinance currently in effect, both parties include in their LR 56.1 Statements and supporting exhibits information that relates to various instances where the Village has applied the 2000 Ordinance. (Pl. LR 56.1 Stmt. ¶¶ 17-18; Def. LR 56.1 Stmt. ¶ 24; Exs. 6-11 to Def. LR 56.1 Stmt.) Neither party argues that these events would not fall within the scope of the amended Ordinance. It is therefore reasonable to infer that, despite changes in the language, the amended Ordinance would apply to these events in the same manner as the 2000 Ordinance did. The Village's explicit purpose in amending the Ordinance, "to clarify the intent of the Village to impose a content neutral policy for being compensated when an individual or organization hosts or sponsors an event that requires the Village to provide special services," does not indicate that the Village was changing the scope of the Ordinance and confirms the reasonableness of this inference. *Id.* § Preamble. Thus, the court will consider these instances to the extent they are relevant to the Village's construction and interpretation of the amended Ordinance.[6]

**FACTUAL BACKGROUND**

A.      **Plaintiff's Political Activities**

Plaintiff, one of the most successful political fundraisers in America, and his family have been active in political affairs at the local, state, and national level for many years. (Pl. LR 56.1 Stmt. ¶ 3; Def. LR 56.1 Stmt. ¶ 1.) In addition to making political contributions, Plaintiff has hosted many fundraisers for federal and state candidates. (Pl. LR 56.1 Stmt. ¶ 4.) Plaintiff testified that he has been hosting fundraisers since the 1980's, and that he has hosted fundraisers in his

---

[6]      Despite that Plaintiff brings a facial challenge to the Ordinance, facts related to the Village's authoritative construction of the Ordinance, which includes its own implementation or interpretation of the Ordinance, remain relevant as they may narrow the construction of the ordinance. *See Forsyth County*, 505 U.S. at 131; *Ward v. Rock Against Racism*, 491 U.S. 781, 795-96 (1989). Even in a facial challenge, a federal court must consider limiting constructions. *See Ward*, 491 U.S. at 795-96 (collecting cases).

Winnetka home since the enactment of the Ordinance he challenges here. (Pl. Dep. at 9; Def. LR 56.1 Stmt. ¶ 1.)[7] Each such event has taken place on private property; Plaintiff has never attempted to hold a political fundraising event or other political event on public property in Winnetka and "has never sought a permit to use Winnetka's streets, parks or Village Hall for a political event." (Def. LR 56.1 Stmt. ¶ 12.)

Plaintiff estimates that he has hosted thirty or forty political fundraisers in his home in Winnetka over the last ten years. (Pl. Dep. at 12.) The events he hosts are limited by the size of his home, which is 12,000 to 15,000 square feet. (Def. LR 56.1 Stmt. ¶ 9.) Plaintiff estimates that he has hosted as many as 150 guests for major political events. (*Id.*) Fundraisers Plaintiff has hosted in his Winnetka home have included events for then-President Bill Clinton, Hillary Clinton during her time as First Lady and as Senator, and innumerable fundraisers for U.S. Senators and Representatives, U.S. Senate candidates, aspiring presidential candidates, state governors, and others. (Pl. Dep. at 12-14.) For example, Plaintiff hosted a fundraising event in August of 2005 for Senator Hillary Clinton; approximately fifteen to twenty people attended the event. (Def. LR 56.1 Stmt. ¶ 11.) Plaintiff did not request any Village resources or contact any Winnetka municipal officials in connection with this event for Senator Clinton and is not aware of anyone who did. (*Id.*) In 2006, Plaintiff hosted a major fundraiser for Congressional candidate Tammy Duckworth. (*Id.* ¶ 14.) Plaintiff also did not request any Village services or apply for a special event permit in connection with the Tammy Duckworth event. (*See id.* ¶ 26.) In fact, there is no evidence in the record that Plaintiff has, to date, been billed by the Village for any special services.

As he states in his affidavit, Plaintiff expects to be active in the same way in the future. (Pl. LR 56.1 Stmt. ¶ 6.) Plaintiff may host, among others, candidates for President of the United States.

_____

[7]     In addition to hosting fundraisers in his Winnetka home, Plaintiff has also hosted fundraisers in homes he owns in other states, in his offices in various states, and in the homes of other Winnetka residents. (Def. LR 56.1 Stmt. ¶ 2.) In addition to politicians, Plaintiff has also hosted show business personalities. (*Id.*)

(*Id.* ¶ 7; Pl. Aff. ¶ 19.)[8]  At the time of Plaintiff's deposition, he also had plans to host fundraisers at

his home for Congresswoman Jan Schakowsky and Illinois Attorney General Lisa Madigan; Plaintiff

also testified that he believed he had a fundraiser scheduled for Illinois Governor Blagojevich in

2006 and for then-Florida gubernatorial candidates Jim Davis and Rod Smith.  (Def. LR 56.1 Stmt.

¶ 14.)  Plaintiff's future events "may require special permits under Chapter 5.66 of the Winnetka

Village Code."  (Pl. Aff. ¶ 21; Pl. LR 56.1 Stmt. ¶ 8.)[9]  Plaintiff asserts that he is less willing to host

political and fundraising events as a result of Chapter 5.66.  (Pl. LR 56.1 Stmt. ¶ 17.)[10]  While

Plaintiff has not explained precisely why he is less willing to host events as a result of the

Ordinance, he testified to various negative effects of the Ordinance, including that it might put him

in violation of Federal campaign contribution limits, and that a politician might be less likely to come

to his home given the controversy surrounding the Ordinance.  (Pl. Dep. at 73-74, 87-88.)

### B.    Security and Services Required for Political Fundraisers[11]

---

[8]        Defendant contends that Plaintiff's statement that he "expects to host" presidential candidates is not supported by his statement in his affidavit that he "may" host such candidates. (Def. LR 56.1 Resp. ¶ 7.)  Both statements leave open the possibility that Plaintiff may or may not host presidential candidates in the future; the statements do not differ in any material way.

[9]        The court agrees with Defendant's contention that Plaintiff's affidavit supports only that the events he plans to host "may" require special permits, not that they "will require" special permits as stated in Plaintiff's LR 56.1 Statement.  (Def. LR 56.1 Resp. ¶ 8.)  Neither Plaintiff's affidavit nor Plaintiff's deposition clarifies for the court why Plaintiff believes that events he hosts in the future may require permits under Chapter 5.66 when Plaintiff has, apparently without repercussion, never applied for a permit under the Ordinance for events he hosted in the past. (Def. LR 56.1 Stmt. ¶ 15.)

[10]       Defendant disagrees with this fact and states "[s]ee Defendant's separate Statement of Material Facts," but gives no further explanation.  (Def. LR 56.1 Resp. ¶ 17.)  This response is insufficient to inform the court or Plaintiff of a dispute of fact.

[11]       In Defendant's Additional Statement of Facts, Defendant makes a second attempt to challenge Plaintiff's knowledge of security matters relating to political fundraising.  (*See* Def. LR 56.1 Stmt. ¶¶ 4-10.)  Defendant is correct that Plaintiff testified that he relies on security staff to take care of the security arrangements for events in his home and that he is not privy to certain details about their activities.  As the court explained above, however, that testimony is not inconsistent with Plaintiff's claim that he has knowledge and an awareness of security matters at political fundraisers.
(continued...)

14

Presidents and presidential nominees travel with "extensive Secret Service protection." (Pl. LR 56.1 Stmt. ¶ 9.)[12] When nationally-prominent individuals, such as the President or senior Congressional leaders come to Plaintiff's home, concerns for the safety of the elected official are heightened and the Secret Service (or other relevant security detail) may require that guests undergo security clearance. (Def. LR 56.1 Stmt. ¶ 13; Pl. Dep. at 47-48.) In carrying out this process, the Secret Service may require that the guest list be limited so that the Secret Service can complete a criminal background check on each guest. (Pl. Dep. at 47-48.) "Representatives" (presumably, members of Congress) and other individuals Plaintiff would want to invite to his home also generate security concerns. (Def. LR 56.1 Stmt. ¶ 13; Pl. Dep. at 50.) The host of a political event, such as Plaintiff, has no control over the safety requirements or demands that a candidate or politician's official security detail may impose on a municipality being visited by the candidate. (Pl. LR 56.1 Stmt. ¶ 10.) These demands may call upon a variety of municipal resources, including services from the local police or the closure of streets or other public areas. (*Id.* ¶ 11.) Sometimes these municipal services are required to protect the candidates and office holders attending the events. (*Id.* ¶ 14.) On occasion, a candidate or official's security staff may request that local police officers protect those attending the event from protestors or vice versa; municipalities may even "cordon off" designated areas for protestors' use at large political events. (*Id.* ¶¶ 12-13.) Because an official's security staff may not always inform the event host or the municipality of the security requirements in advance, the costs may not be predictable in advance. (*Id.* ¶ 15.) Indeed, according to Plaintiff, the Secret Service's plans are often purposely unpredictable for security reasons. (*Id.* ¶ 16.)

---

[11](...continued)
(S*ee supra* Motion to Strike, Section B.)

[12]    Defendant challenges this assertion, (Def. LR 56.1 Resp. ¶ 9), but it is supported by Plaintiff's testimony that there are "several layers of security" surrounding the President of the United States and that security became "much more expansive" after 9/11. (Pl. Dep. at 16-17.)

## C.    Implementation of Chapter 5.66

Joseph DeLopez has been employed as the Winnetka Chief of Police since 2002 and is primarily responsible for administering the Ordinance, which includes everything from reviewing the requests made under the Ordinance to setting the amount of the user fee for any special event using the formula established in § 5.66.050.  (Def. LR 56.1 Stmt. ¶ 20.)  Lt. Frank Siwak is the Winnetka Police Department's Operations Lieutenant and is responsible for coordinating events involving the United States Secret Service.  (*Id.* ¶ 21.)  In total, the Winnetka Police Department has thirty-seven full-time employees, including fourteen line-level officers.  (*Id.* ¶ 31.)  Plaintiff does not dispute that "the Police Department operates at or below minimum staffing, which requires the Police Department to call in off-duty personnel and to pay overtime rates" when someone requests the exclusive assignment of an officer for an event.  (*Id.*)  In certain (unspecified) circumstances, the Village asserts, Community Service Officers and Communications Officers may be assigned duties at special events.  (*Id.*)  Because of staffing limitations, special detail requirements imposed by the U.S. Secret Service may require the Village to request assistance from other local law enforcement agencies pursuant to mutual aid agreements.  (*Id.* ¶ 32.)  The Village has a mutual aid agreement with the State of Illinois for emergency purposes, but it does not have one with the Secret Service or the Capitol Police.  (*Id.*)[13]

All inquiries related to special event permits are directed to and processed by the Police Department.  (Def. LR 56.1 Stmt. ¶ 22.)  According to DeLopez and Siwak, on past occasions, the Secret Service, Capitol Police, Illinois State Police, and other law enforcement agencies have contacted them to notify them that a security detail would be present in the Village in connection with an official's appearance at an event occurring in the Village.  (*Id.* ¶ 23.)  Such contacts do not

---

[13]    Mutual aid agreements enable the Village to obtain assistance from other local law enforcement agencies when necessary.  (Declaration of Lieutenant Frank J. Siwak ¶ 17, Ex. 2 to Def. LR 56.1 Resp.)

necessarily involve requests for services but may simply alert the Village officers to the presence of the official and his or her security force. (*Id.*) It is undisputed that when the Secret Service, Capitol Police, or Illinois State Police do request Village services, the Village does not review the request but simply provides the services, equipment, and other resources that are requested. (*Id.* ¶ 30.) If the event is a Presidential visit, if the Secret Service requests special details, or if the event is a large one involving special details of three or more, "special orders," a concept the Village does not explain, are issued to govern the Winnetka Police Department's operation at the event. (*Id.*)

According to Officer DeLopez, the permit requirement does not apply to public demonstrations and has never been applied to public demonstrations, which, according to the Village, include "union picketing or political leafleting." (Pl. LR 56.1 Resp. ¶ 24; Declaration of Chief of Police Joseph A. DeLopez ¶ 9, Ex. 1 to Def. LR 56.1 Stmt.) (hereinafter "DeLopez Aff.") Plaintiff challenges this assertion, but he cites to language stating that the Ordinance applies to events affecting "use of public streets, rights-of-way or sidewalks" that appears only in the original ordinance, not the version at issue here; therefore, the court deems Plaintiff to have admitted that the permit requirement does not apply to public demonstrations. (Pl. LR 56.1 Resp. ¶ 24.) It is further undisputed that the Village has never applied the special event permit requirements to parades, (*id.*), presumably pursuant to the Ordinance's exception for "annual community-wide" events. Winnetka Vill. Code § 5.66.020(D)(7).

The Village contends that it learns of a special event only if the host, sponsor, or relevant security force (for a government official or celebrity) contacts the Village, and that special event permits are not required if no special Village services are requested or required for an event. (Def. LR 56.1 Stmt. ¶ 22.) Defendant asserts, further, that its official review of a request for special services does not involve evaluating the content of the activity or beliefs of the sponsor or guests, and is instead restricted to a determination of what Village services are required based on information from the applicant. (Def. LR 56.1 Stmt. ¶ 25.) Some provisions of the Ordinance do,

17

however, appear to contemplate the occurrence of a "special event" without any advance notice to the Village, and the provision of "special services" even absent a request from the host or sponsor. For example, § 5.66.040(F) provides that "any person who holds or sponsors a special event without submitting a complete application and paying the required deposit at least five (5) days before the special event, shall be subject to a late payment fee equal to the total of the user fee and the supplemental user fee." And in § 5.66.050(A), the Village "reserves the right to assign other or additional fire, police and/or other Village personnel ,. . . if the Village Manager, Chief of Police, Fire Chief, Public Works Director or Water and Electric Director determines that such other or additional personnel is warranted by the nature of the event." Similarly, in § 5.66.050(B) the Village reserves the right to assign additional equipment to a special event if the relevant Village officials determine that the use of such additional equipment is warranted. Officer DeLopez nonetheless asserts that in determining what equipment and street closures are necessary, the Village considers the resources requested by the applicant and "the information provided by the applicant about the projected number of attendees at the event." (DeLopez Aff. ¶¶ 31-32.) Officer Siwak described a similar process; he explained that the review does not involve a review of the beliefs of the event's sponsor or those of any guests or attendees, and that the review is limited to determining what Village services are necessary based on the projected number of attendees and the specific request for particular security services. (Declaration of Lieutenant Frank J. Siwak ¶ 27, Ex. 2 to Def. LR 56.1 Resp.) (hereinafter "Siwak Aff.") Thus, according to the Village, in practice, its review does not involve evaluating the content of the activity or beliefs of the sponsor or guests. (*See* Def. LR 56.1 Stmt. ¶ 25.)

It is undisputed that Plaintiff has never applied to the Village for special services or for a special event permit under the Ordinance and that no one else has requested services requiring such a permit for an event at his residence. (Pl. LR 56.1 Resp. ¶¶ 15, 26.) Plaintiff asserts, however, that he feels obliged to inform candidates about this lawsuit in order to avoid any

18

controversy that might arise for a candidate as a result of his involvement in this challenge to the constitutionality of the Ordinance. (*Id.* ¶ 19.) Plaintiff admits that the Winnetka Police Department has never been dispatched to Plaintiff's home in connection with an event and, in fact, the Village has not stopped or interrupted any event in Winnetka, including at his residence or any other, because of a failure to obtain a special event permit. (*Id.* ¶¶ 26, 29.)

Plaintiff disputes Defendant's assertion that he has never asked the Village to "cordon off" some of his property for an event, which, Plaintiff contends, "may have" occurred during the 1996 event for President Clinton. (*Id.* ¶ 26) (*compare* Pl. Dep. at 28 (stating that his property was cordoned off during the 1996 event for President Clinton).) It is undisputed, however, that the Village has never cited anyone, including Plaintiff, for violating Chapter 5.66, and the Village has never denied a special event permit or services because the requesting party failed to comply with the notice requirement in Chapter 5.66. (*Id.* ¶¶ 27-28.) The sole instance in which the Village has denied a request for services at a special event after the Ordinance's amendment occurred in May of 2006, when a resident inquired about having a fireworks show on his private beach. (*Id.* ¶ 33; Ex. 12 to Def. LR 56.1 Stmt.) That resident never filed a formal application for a permit or special services after his initial inquiry, but was informed that the Village is at maximum staffing on the 4th of July and would not be able to provide support for the event. (*Id.*)

As the court explained above, instances in which the Village applied the 2000 Ordinance are relevant to assessing the way in which the Village interprets the amended Ordinance. Under the earlier enactment, special event permits "have been issued for a variety of events, including a live band's appearance at a party on a private beach, a multi-day children's fair, a church rummage sale, and appearances of political figures at private events." (Def. LR 56.1 Stmt. ¶ 24; Exs. 6-11 to Def. LR 56.1 Stmt.) The Village has billed various Winnetka residents for their use of Village services, including: $2,518.50 to Edgar Jannotta for fifty-four hours of police services provided by three different local police departments in connection with a visit by First Lady Laura Bush; $5,335

to the Winnetka Children's Fair for ninety-seven hours of police security services; $4,138.75 to Christ Church Rummage Sale for 75.25 hours of police security services; $75,333.67 to Patrick Ryan for 899.25 hours of police services and various other costs to the public works, fire, and administration departments in connection with a fundraiser held for President Bush; and $6,585 to Patrick Ryan for police services in connection with a fundraising event attended by First Lady Laura Bush. (*See* Exs. 6-11 to Def. LR 56.1 Stmt.)

## DISCUSSION

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 988 (7th Cir. 2006). In determining whether a genuine issue of material fact exists, the court will construe all facts and draw all reasonable and justifiable inferences in the light most favorable to the non-moving party, in this case, the Village. *See Greer v. Amesqua*, 212 F.3d 358, 367 (7th Cir. 2000) (citation omitted). Before addressing Plaintiff's constitutional challenge, the court will briefly consider Plaintiff's standing to bring this action.

### A.    Standing

The court has an obligation to ensure its own jurisdiction. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (citing *Allen v. Wright*, 468 U.S. 737, 750 (1984)). Defendant challenged Plaintiff's standing at length in its motion to dismiss, arguing that Plaintiff has not alleged "an actual or imminent injury," and that the impact of the Ordinance is speculative and depends on the conduct of third parties who may impose security requirements on events Plaintiff wishes to sponsor. (Def. Mot. to Dismiss at 3-5.) On summary judgment, Defendant is not explicit that it is challenging Plaintiff's standing to sue but its arguments imply as much: in opposition to Plaintiff's motion, Defendant urges that Plaintiff has presented no evidence that the Ordinance has affected

his First Amendment rights because he has never requested special services from the Village, and that the security details for the guests Plaintiff has hosted have never requested, demanded, or required special services. (Def. Opp'n to SJ at 10.)

Plaintiff insists that the Ordinance does clearly apply to Plaintiff's proposed political activities, that Plaintiff has every reason to expect that he will be billed for use of the Village's services in the future should he host an candidate with security needs, and that Plaintiff therefore has standing to sue despite never having applied for a permit under the Ordinance. (Pl. SJ Reply at 6; Pl. Opp'n to Mot. to Dismiss at 2-4.)[14]  In addition, Plaintiff argues that the Ordinance "threatens others not before the court" who may want to engage in protected expression but decline to do so rather than risking prosecution or undertaking a challenge of the law. (Pl. Mot for SJ at 7) (quoting *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (citation omitted)).


Broadly written laws have the potential to chill the expressive activity of parties not before the court; thus, an exception to general standing rules arises in the context of the First Amendment subjecting some laws to facial challenges even if their application in the case under consideration may not be constitutionally objectionable. *See Forsyth County*, 505 U.S. at 129; *see also Sequoia Books, Inc. v. Ingemunson*, 901 F.2d 630, 634 (7th Cir. 1990) (noting standing doctrine's "special flexibility" in the First Amendment context). In *Forsyth*, for example, an organization sought to demonstrate in opposition to a federal holiday challenged a county ordinance that required permits for private demonstrations, declared that participants must bear the cost of additional law enforcement for protecting participants in activities on public property, and required permit applicants to a pay a fee, which the count administrator could adjust to meet the expense incident

---

[14]     In his summary judgment reply, Plaintiff expressly adopts the arguments related to standing set forth in his response to Defendant's motion to dismiss. (Pl. SJ Reply at 6; Pl. Opp'n to Mot. to Dismiss at 2-4.)

to the administration of the ordinance or maintaining public order. 505 U.S. at 126-27. The plaintiff organization challenging the ordinance in *Forsyth* had never paid the fee or held the demonstration, but the Court nevertheless acknowledged its standing to mount a facial challenge to the ordinance. *Id.* at 127.

"[O]ur cases have long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 755-56 (1988) (collecting cases); *see FW/PBS*, 493 U.S. at 223 (citation omitted). In *City of Lakewood*, where a newspaper publisher contended that the challenged ordinance gave the mayor unbounded discretion to grant or deny permits relating to the placement of newsracks, the Supreme Court found plaintiff had standing to bring a facial challenge, though plaintiff itself had never applied for a permit under that particular ordinance. *See id.* at 754, 760. Similarly, in *Southworth v. Board of Regents of the University of Wisconsin System*, the Seventh Circuit found students to have standing to bring a facial challenge to the University's mandatory activity fee without applying for or having been denied funding. 307 F.3d 566, 581 (7th Cir. 2002).

Though Plaintiff contends that the Ordinance in this case vests unbridled discretion in the Winnetka Chief of Police and Village officials to issue or deny permits, determine the amount of Village services required, waive permit requirements, and to set permit fees, Plaintiff does not claim that he has applied for or has been denied a license for a "special event" under the Ordinance nor that he has been charged a fee under the Ordinance. (Pl. Mot for SJ at 12-14.) As *City of Lakewood* and *Southworth* establish, however, such acts are not necessary to confer standing. *City of Lakewood*, 486 U.S. at 755-56; *Southworth*, 307 F.3d at 581.[15]

---

[15] Nor is the court persuaded by Defendant's contention that the Ordinance has not (continued...)

In *Southworth*, the court concluded that the students had standing to challenge the University's fee system based on its "alleged failure to conform with the constitutional requirement of viewpoint neutrality by granting unbridled discretion to those making the funding decisions" and then proceeded to determine whether the fee system did "in fact vest the student government with unbridled discretion." 307 F.3d at 580-81. Similarly, here, the court recognizes that the Ordinance is alleged to vest unbridled discretion in Village administrators to grant or deny permits, to set fees for special services, to determine the amount of special services needed, and to waive fees and other requirements the Ordinance imposes. *See City of Lakewood*, 486 U.S. at 755. It is further without question that the unbridled discretion standard applies to the Ordinance here.[16] Additionally, the Ordinance's regulation of "special events," which encompasses events at which expression occurs, has "a close enough nexus . . . to conduct commonly associated with expression." *See City of Lakewood*, 486 U.S. at 759. Thus, the court concludes that Plaintiff has standing to challenge the Ordinance on its face.

B.     **Constitutionality**

In moving for summary judgment, Plaintiff contends that the Ordinance is invalid on its face because it discriminates on the basis of the viewpoint of the speech; is not a valid time, place, and

---

[15](...continued)
affected others, which, according to Defendant, is evident because the Village has not experienced a decline in special events applications since the enactment of the Ordinance (Def. Opp'n to SJ at 11.) Even if Defendant is correct that First Amendment activity has not yet been chilled, the inability to demonstrate that the Ordinance has had an actual chilling effect does not preclude a facial challenge. *See Forsyth*, 505 U.S. at 129 (approving of the facial review of an ordinance and stating "that the very existence of some broadly written laws has the *potential* to chill the expressive activity of others not before the court") (citations omitted) (emphasis added).

[16]     Plaintiff contends that the Ordinance is not viewpoint neutral. *Southworth* establishes that the requirement of viewpoint neutrality incorporates the rule against granting administrators unbridled discretion. *Southworth*, 307 F.3d at 578-81. Plaintiff also challenges that the Ordinance is an invalid time, place, and manner regulation. It is well-established that a time, place, and manner regulation must contain adequate standards to guide administrators. *See Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002).

manner restriction; impermissibly restricts private First Amendment activity; and lacks the necessary administrative standards to prevent arbitrary enforcement. (Pl. Mot. for SJ at 7-14; Pl. SJ Reply at 5-12.) In response, Defendant argues that the Ordinance has not affected Plaintiff's First Amendment rights, that Plaintiff has not established that the Ordinance regulates the content of speech, and that Plaintiff has not established a First Amendment right to free public services. (Def. Opp'n to SJ at 6-12, 14.) Defendant emphasizes that the permit process established in the Ordinance is not a grant of permission to hold an event but rather only standardizes the circumstances "under which individuals will be allowed to use the Village's services." (*Id.* at 9.)[17]

Defendant also argues that Plaintiff cannot sustain a facial challenge to the Ordinance because Plaintiff has not established that the Ordinance is unconstitutional in every application. (*Id.* at 4.) The court agrees with Plaintiff's view that it is not necessary for him to prove that the Ordinance is unconstitutional in every application to establish facially invalidity. (Pl. SJ Reply at 7-8.) The fact that a party may bring a facial challenge even when the application of the challenged ordinance to that party is not objectionable validates Plaintiff's view. S*ee Forsyth County*, 505 U.S. at 129. After all, it would be futile for a court to allow a party to bring a facial challenge in such circumstances if the lack of an objectionable application in the case before the court required dismissal. The court addresses Plaintiff's other challenges to the constitutionality of the Ordinance in turn.

---

[17]     Defendant also contends that, to the extent Plaintiff claims the Ordinance prevents him from exercising his First Amendment rights because doing so may cause him to run afoul of the Federal Election Commission's (FEC) limits on campaign contributions, Plaintiff must exhaust his administrative remedies before the FEC. (*Id.* at 12-13.) Plaintiff responds that he is not arguing that the Ordinance is preempted by the Federal Election Campaign Act ("FECA"), 2 U.S.C. § 431 *et seq.*, and admits that whether an individual can pay a large permit fee in relation to a fundraiser for a federal candidate and abide by federal election law remains an open question. (Pl. SJ Reply at 7.) Only a First Amendment question is properly before the court in this matter and the court will not endeavor to interpret or speculate as to the meaning of FEC regulations. A First Amendment challenge based on an interpretation of FECA that the FEC may or may not adopt is not ripe at this time.

### 1.    Content and Viewpoint Neutrality

Plaintiff argues that the Ordinance is viewpoint-discriminatory.  That the government may not regulate speech based on its viewpoint or content is, of course, a fundamental First Amendment principle.  *See Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828-29 (1995).[18] Regulations designed to restrain speech on the basis of its content are presumptively invalid.  *See Schultz v. City of Cumberland*, 228 F.3d 831, 840 (7th Cir. 2000) (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992)).  "Listeners' reaction to speech is not a content-neutral basis for regulation."  *Forsyth*, 505 U.S. at 134 (citations omitted).

Plaintiff contends that the Ordinance in this case restrains speech on the basis of content by creating a permit system that considers the "extent of interference with or disruption of the normal use and operation of" Village property.  (Pl. Mot. for SJ at 7-9.)  WINNETKA VILL. CODE § 5.66.050(C).  According to Plaintiff, the extent of Village resources required is left "entirely to the discretion of Village officials" who have the right to assign and charge the host or sponsor for additional personnel and equipment if they believe additional resources are "warranted by the nature of the event."  *Id.* §§ 5.66.050(A), (B).  Plaintiff also contends that the Ordinance's provision allowing the Village to deny a permit if the event "substantially or unnecessarily" disrupts traffic flow, interferes with access to business or residences, or interferes with specified Village services is viewpoint-discriminatory.  (Pl. Mot. for SJ at 8.)  In Plaintiff's view, the effective result of the provisions he cites, §§ 5.66.050(A)-(C), is that the Village will consider the content of speech by evaluating "the presence and the number of protestors, and the size of the security risk to any

---

[18]    The court uses "content" and "viewpoint" interchangeably.  The Supreme Court noted the lack of a distinction between content and viewpoint restrictions in *Arkansas Writers' Project, Inc. v. Ragland*, stating that the impropriety of "content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic."  481 U.S. 221, 230 (1987) (quoting *Consolid. Edison Co. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530 (1980)).

attending political figures." (*Id.*) These factors, according to Plaintiff, "depend entirely on the identity of the political figure and the message he or she is expected to convey." (*Id.*)

In response, Defendant observes that the permit application seeks only objective information, and that Plaintiff failed to note that even in the case where a special event causes substantial or unnecessary interference of the type that the Ordinance specifies in §§ 5.66.040(J)(6)-(7), a permit will be denied only if there are not sufficient Village resources available to mitigate the disruption at the time of the proposed event. (Def. Opp'n to SJ at 7-8.) Further, Defendant argues, the special permit issued pursuant to the Ordinance is not a "grant of permission to hold an event," but only a "mechanism for standardizing the circumstances under which individuals will be allowed to use the Village's services." (*Id.* at 9-10.) The court concludes that Plaintiff is not entitled to summary judgment on his claim that, as construed by the Village, the Ordinance permits Village officials to assess listener reaction and discriminate on the basis of viewpoint.

In assessing the parties' arguments, the court is guided by *Forsyth and MacDonald.* While Plaintiff argues that the permit fee system that the Supreme Court held unconstitutional in *Forsyth* is "materially indistinguishable" from the Village's permit system here, the court finds that this case resembles *MacDonald* at least as closely as it does *Forsyth.* (*Id.*) In *Forsyth*, a county ordinance required organizations obtaining a permit for a parade, demonstration, road closing, or other uses of public property for private purposes to pay "a sum not more than $1,000" for each day the event took place; the ordinance further empowered the county administrator to "adjust the amount to be paid in order to meet the expense incident to the administration of the ordinance and to the maintenance of public order in the matter licensed." *See* 505 U.S. at 126-27. The plaintiff organization in *Forsyth* mounted a facial challenge to the ordinance, contending that the ordinance did not prescribe adequate standards for the county administrator, which, according to the plaintiff, allowed for viewpoint discrimination. *Id.* at 130. The Court held that the ordinance invested

unbridled discretion in the administrator and, as construed by the county, "the ordinance often [required] that the fee be based on the content of the speech." *Id.* at 132-34.

In *MacDonald*, decided by the Seventh Circuit after *Forsyth*, the plaintiff brought a facial challenge to a City of Chicago ordinance that, while it did not impose fees, required anyone planning to conduct a parade on a public street or sidewalk to obtain a permit from the Commissioner of the Chicago Department of Transportation. 243 F.3d at 1023, *cert. denied*, 534 U.S. 1113 (2002). The plaintiff argued that the ordinance vested the Commissioner with unfettered discretion and that it was an improper prior restraint on speech. *Id.* at 1026, 1029. The Seventh Circuit concluded that the ordinance did not afford the Commissioner an unconstitutional level of discretion; the court analyzed the ordinance as a time, place, and manner regulation, as opposed to a prior restraint on speech, and held that the Commissioner's consideration of whether the proposed activity would interfere with traffic and police and fire protection was content-neutral and related to safety. *Id.* at 1028-29, 1032-33.

Citing *Forsyth*, Plaintiff insists that an assessment of the security needed in light of the expected hostility toward the planned speech amounts to an unconstitutional content-based examination of the expression. (Pl. Mot. for SJ at 8.) In determining that the ordinance in *Forsyth* contained "more than the possibility of censorship through uncontrolled discretion," the Court examined how the ordinance was construed by the county. *See id.* at 133-34. The *Forsyth* court instructed that, even in a facial challenge, the court must consider the government body's authoritative constructions, implementation, and interpretation of the ordinance. *See id.* In doing so, the Court found that the county envisioned that the administrator would assess a fee to cover the costs of "necessary and reasonable protection of persons participating in or observing said activity," and concluded that this assessment would necessarily depend on the administrator's "measure of the amount of hostility likely to be created by the speech based on its content." *See id.* at 134 (internal quotations omitted). The Court noted specific evidence that the county intended

that the fee would be a function of the public's reaction to the speech.  *See id.* at 135-36, n.12.  Not only was the ordinance clear that the fees charged were for the protection of those participating in or observing the speech, but the county readily admitted that it did not charge a fee for police protection at the 4th of July parades, which required closing streets and drew large crowds, but imposed a fee only in instances where county officials deemed it necessary to provide security from angry crowds.  *See id.* at n.12.  The county further admitted that payment for police protection was the most important purpose underlying the ordinance and argued that a charge for expressive activity that would generate potentially violent reactions was permissible because there was a cap to the fee.  *See id.*[19]

As *Forsyth* demonstrates, it is proper for this court to consider the Village's construction of the ordinance, "including its own implementation and interpretation of it" in determining whether the Ordinance is viewpoint discriminatory.  *See Forsyth County*, 505 U.S. at 131 (citations omitted).  If the language of the Ordinance or the Village's interpretation or implementation reveals that the Village assesses the public reaction to the speech to determine the need for Village services, thereby evaluating the content of the speech, *Forsyth* would control here.  The court, however, finds differences between this case and *Forsyth* that preclude summary judgment in favor of Plaintiff.

The stated purpose of the Ordinance here is to ensure that persons who sponsor events that require special services pay the Village's costs in providing such services.  WINNETKA VILL.

---

[19]     The Seventh Circuit set forth a similar analysis in *Church of Am. Knights of Ku Klux Klan v. City of Gary*, which involved a challenge to an ordinance that allowed the City's police chief to determine what police protection would be necessary for a parade and open-air assembly and to impose a fee to cover the cost of the necessary protection. 334 F.3d 676, 678-79 (7th Cir. 2003). While this challenge was not a facial one, the Seventh Circuit's reasoning remains instructive as to when the assessment of a fee for government services or police protection is content-based. Similar to *Forsyth*, the fee system in *Church of American Knights* was held to be viewpoint-discriminatory because it was based on the public reaction to the speech, as evidenced by the City's consideration of the arrest records of Klansman who desired to hold the rally when considering the necessary police protection.  Further, the City acknowledged that if 100,000 Girl Scouts conducted a march, the fee would be zero, while a rally of fifty Klansman generated a fee of $4,935.  *Id.* at 681-82.

CODE § 5.66.010. While the Ordinance lists "police protection" as a special service that the Village must be reimbursed for under the Ordinance, this service is only one of a non-exhaustive list of ten services that vary from garbage removal to street cleaning. The Village asserts that its implementation and interpretation of the Ordinance confirm that the fee charged under the Ordinance is not intended to be a function of the public reaction to the speech and that the public reaction is not considered by the Village in assessing the services necessary.

The instances in which the Village applied the 2000 Ordinance reveal the Village's efforts to recoup its cost for the provision of Village services for all types of events, regardless of their speech or content. Among these events were political fundraisers, the Winnetka Children's Fair, and a church rummage sale. (Exs. 6-11 to Def. LR 56.1 Stmt.) Officer DeLopez explained that the Village determines the necessary equipment and street closures based not on the identity of the guest(s) at the event or their planned speech but instead on the resources requested by the applicant and "the information provided by the applicant about the projected number of attendees at the event." (DeLopez Aff. ¶¶ 31-32.) Officer Siwak described a similar process, stating that the review does not involve a review of the beliefs of the event's sponsor or any guests or attendees, and that the review is limited to determining what Village services are necessary based on the "projected number of attendees" and the "specific request for particular security services." (Siwak Aff. ¶ 27.) Plaintiff does not dispute that when the Secret Service, Capitol Police, or Illinois State Police request Village services, the Village does not review the request but simply provides the services, equipment, and other resources that are requested. (Pl. LR 56.1 Resp. ¶ 30.) In this litigation, Defendant has acknowledged that assigning services on the basis of audience reactions and billing citizens for those services would raise constitutional problems. (Def. Mot. to Dismiss at 8.) If it is the Village's practice to consider only the Village services requested and the number of attendees projected by the applicant in determining the Village services necessary for special events, the Ordinance might well be more explicit in so stating. As noted, §§ 5.66.050(A) and (B)

reserve to the Village the right to assign additional personnel or equipment to an event if such additional personnel or equipment are "warranted," in the Village officials' judgment. Nevertheless, the court concludes the evidence concerning the Village's interpretation and implementation creates a dispute that precludes summary judgment for Plaintiff.

As set forth in the Officers' affidavits, the Village's interpretation and implementation of the Ordinance does not contemplate an assessment of listener reaction when determining the special services to be provided at an event. If this is true, this case is not controlled by *Forsyth* and more closely resembles *MacDonald*. The parade ordinance at issue in *MacDonald* required the administrator to consider whether a sufficient number of officers were available to police and protect participants and non-participants in the activity from traffic hazards in light of other demands for police protection at the time of the event. *See* 243 F.3d at 1032. This provision, the Seventh Circuit concluded, did not inject an assessment of the content of the speech into the scheme because it only required consideration of the size of parade and its nature (i.e. route and time). *See id.* at 1033-34.[20]

Because there is evidence that under the Village's interpretation of the Ordinance, the services necessary are determined solely by the requests for services and attendance projected by the host, sponsor, or relevant security force, Plaintiff is not entitled to summary judgment on his claim that the ordinance is a content-based speech regulation. If Village officials do not consider the content of the speech that Plaintiff's activities support, the special permit review does not evoke the fundamental concern with content-based speech regulations that the "government may not

---

[20]    While it is true that the Ordinance at issue in *MacDonald* did not contemplate a fee, unlike the Ordinance in this case and in *Forsyth*, nothing in *Forsyth* or *MacDonald* stands for the proposition that a content-neutral fee is improper. And, as Judge Rovner stated in her dissent in *MacDonald*, an ordinance authorizing a fee may be "less intrusive" than one that bans speech where the governing body will not issue a permit as, in the latter case, "there is no amount a marcher can pay to be allowed to march if the City decides the burdens are too great." 243 F.3d at 1039 (Rovner, J., dissenting). According to Judge Rovner, under *Forsyth*, it is "both a fee and a ban based on content" that cannot stand. *Id.*

grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *See City of Renton v. Playtime Theatres, Inc.* 475 U.S. 41, 48-49 (1986) (citation omitted). Plaintiff emphasizes the possibility that a candidate or official's security detail may request police presence to protect candidates or office holders attending the events. (Pl. LR 56.1 Stmt. ¶ 12.) When such a request is made, it is not the Village that is predicting the listener reaction to the content of speech but the requesting party. In Plaintiff's estimation, "it matters not whether the determination that [security] resources are required comes from the event host, the Secret Service, or Village personnel . . . ." (Pl. SJ Reply at 8-9.) The court disagrees. The First Amendment is concerned with the *government*'s regulation of speech. *See Ward*, 491 U.S. at 791 ("The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.") Thus, who determines the need for security resources is highly relevant to whether or not the government—in this case, the Village—is making a content-based determination.

There is no indication from the text of the Ordinance that the Village officials responsible for the Ordinance's administration are even aware of the viewpoint to be expressed or promoted at the special event. The Ordinance does not specify that a description of the event must indicate the subject matter or purpose of the event or the identity of any featured speakers or guests. *See* WINNETKA VILL. CODE § 5.66.040(B).[21] While the Ordinance does allow the Village to obtain information "necessary in order to determine the nature and extent of municipal services to be

---

[21] A copy of a special event permit application filled out by a Winnetka resident that applied for, and was granted, a permit in 2004 confirms that the application, while it does ask the applicant to "describe the nature of the event," does not specifically ask who will be present at the event or what will be taking place. (*See* Ex. 7A to Def. LR 56.1 Stmt.) In this particular instance, the applicant described the nature of the event as a "concert on private beach approx. 350 guests"; at no point in the application did the resident provide any further details about the concert or who would be performing. (*Id.*) The parties do not indicate that the permit application has changed under the amended Ordinance, and this 2004 application comports with the description of the application in the amended Ordinance.

provided," there is no evidence that such additional information relates to the content of the speech. In *MacDonald*, the Seventh Circuit distinguished a parade ordinance from the fee system challenged in *Forsyth*, in part, because the permit application being challenged did not request information on the content of the marchers' speech, indicating that the Commissioner reviewing parade permit applications himself would not be aware of the content of the expression in most situations.  *See MacDonald*, 243 F.3d at 1033.[22]

Plaintiff notes that the Ordinance authorizes the Village to deny a permit if the proposed event "substantially or unnecessarily" causes certain interference or disruption: specifically, interference with traffic, with police, fire, electric, or public works services, or with businesses or residences in the immediate vicinity of the event.  WINNETKA VILL. CODE §§ 5.66.040(J)(6)-(7). Plaintiff contends these provisions enable the Village to deny a permit "based on a forecast of potentially negative listener reaction."  (Pl. Mot. for SJ at 9.)  As described earlier, however, the Village has presented evidence, sufficient to defeat summary judgment on this issue, that it does not consider potential listener reaction in making permit decisions.[23]

Although Plaintiff has not fully developed the argument, the court notes a possible "chilling effect" from the Village's post-event imposition of fees in circumstances where the host had not applied for a permit but special services are deemed necessary.  In its motion to dismiss and in oral arguments on these motions, the Village has asserted that it would not bill a sponsor or resident in such circumstances, if the need for additional services arose because of the Village's

_____

[22]    In her dissent in *MacDonald*, Judge Rovner opined that it was disingenuous for the City to claim that it was unaware of the content of the speech, in part, because the permit application required the applicant to inform the City of the basis upon which the applicant estimated the number of people participating in the parade.  *See* 243 F.3d at 1039 (Rovner, J., dissenting). Nothing in the record in this case indicates that the Village solicits an explanation of the applicant's projected number of attendees.

[23]    Plaintiff's argument that the Ordinance violates the law unless it requires that the Village authorize a similar event is addressed below, in the discussion of the Ordinance's validity as a time, place, and manner restriction.

assessment of the audience's reaction to an event. (Def. Mot. to Dismiss at 8; 7/12/06 Trans. at 9.) The court notes this assurance does not appear in the text of the Ordinance itself, nor has Defendant presented evidence that its officials so construe the Ordinance. The court is unwilling to enter summary judgment in favor of Plaintiff where he has not developed the argument, but will entertain a renewed motion on an appropriate record.

### 2. Time, Place, and Manner Regulation

#### a. Validity

In addition to challenging the Ordinance as viewpoint discriminatory, Plaintiff separately contends that the Ordinance is not a valid time, place, and manner regulation. (Pl. Mot. for SJ at 9-11.)[24] Traditionally, governments are allowed to impose reasonable restrictions, even in public fora, on the time, place, and manner of protected speech as long as the restrictions "are justified without reference to the content of the regulated speech . . . are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of information." *Ward*, 491 U.S. at 791; *MacDonald*, 243 F.3d at 1032. The seminal case of *Ward v. Rock Against Racism* illustrates a traditional time, place, and manner restriction. In *Ward*, New York City passed a regulation requiring performers at a Central Park bandshell to use sound-

---

[24]        In one instance, Plaintiff characterizes the Ordinance as a "prior restraint on free speech." (Pl. Mot. for SJ at 12.) In *Thomas*, the plaintiff challenged a Chicago Park District Ordinance that required a person to obtain a permit in order to hold a "public assembly, parade, picnic, or other event involving more than fifty individuals," or to engage in activities that involve creating or emitting "amplified sound." 534 U.S. at 318. The ordinance specified thirteen grounds on which a permit could be denied, including that the activity would present "an unreasonable danger to the health or safety of the applicant" or the public. *Id.* at 319. The Court determined that none of the grounds had "anything to do with what a speaker might say," noting that the ordinance was not even directed at "communicative activity." *Id.* at 322. Because the ordinance was not aimed to censor the subject-matter of speech, the court did not require that the ordinance contain the procedural safeguards that are necessary when a government imposes a prior restraint on speech; rather, the Court viewed the ordinance as a regulation of the time, place, and manner of use of the public fora. *Id.* Likewise, the Ordinance in this case is not concerned with "subject-matter censorship" or "what a speaker might say," therefore the court will not address the doctrine of prior restraint.

amplification equipment and a sound technician provided by the City in order to prevent excessive sound amplification from intruding on those using and living in and near the park. *Id.* at 784. The plaintiff, who had sponsored speeches and rock music at the bandshell, challenged this regulation as facially invalid under the First Amendment. *Id.* The Court found that the City's sound-amplification regulation was a reasonable regulation of the time, place, and manner of expression; the regulation was narrowly tailored to serve the substantial and content-neutral government interests of preventing excessive sound volume and providing sufficient amplification at the concert grounds, and the regulation left open ample channels of communication. *Id.* at 803.

The Ordinance in this case regulates compensation to the Village for the use of Village services at "special events," which can occur on either public or private property. *See* WINNETKA VILL. CODE § 5.66.020. Plaintiff's only challenge to the constitutionality of the Ordinance as a time, place, and manner restriction focuses on the restrictions imposed on speech in traditional public fora, such as on public streets and sidewalks. (Pl. Mot. for SJ at 9-11.) The court notes at the outset that the Ordinance does not fit squarely into the category of time, place, and manner regulations; the primary aim of the Ordinance is not to regulate the time, place, and manner of First Amendment exercise but to enable the Village to recoup its cost for special services it may need to provide for private events. In any case, Plaintiff argues that the Ordinance is invalid as a time, place, and manner restriction and Defendant does not argue that this framework is an improper one. The court therefore addresses the Ordinance under that framework.

A valid time, place, and manner regulation first "must be justified without reference to the content of the regulated speech." *Ward*, 491 U.S. at 791; *MacDonald*, 243 F.3d at 1032. As discussed above, the court concludes that Plaintiff has not established that the Ordinance discriminates on the basis of viewpoint or content as a matter of law. Plaintiff's argument that the Ordinance was intended to target political speech relies on language from the 2000 Ordinance that is no longer a part of the Ordinance as it exists today, (Pl. Mot. for SJ at 10), but, as explained

34

earlier, the language of the 2000 Ordinance is not relevant to this action. (*See supra* Motion to Strike, Section C.)

The second requirement necessary for a valid time, place, and manner regulation, is that the regulation serve a substantial government interest. *MacDonald*, 243 F.3d at 1032. The Ordinance's preamble sets forth the government's interest in protecting "the general health, safety and welfare of the Village as a whole." Winnetka Vill. Code § Preamble. According to the Ordinance, the Village's ability to protect the health, safety, and welfare of the Village is compromised when it provides special services, which "requires the Village to reallocate its resources, imposes additional costs on the Village, exposes the Village to additional liability, and can interfere with the normal use of public ways and Village property." *Id.* The Seventh Circuit stated unequivocally in *MacDonald* that the promotion of the safety of citizens, or, more specifically, "the organized, effective and safe flow of traffic, including emergency vehicles" represented a significant government interest. *See* 243 F.3d at 1034. Likewise, the Ordinance here promotes the health, safety, and welfare of citizens by, among other aims, ensuring that Village resources are not allocated at a particular time so as to jeopardize public health and safety and protecting the normal use of public ways and Village property. The court finds that the Ordinance promotes a significant government interest.

Finally, a valid time, place, and manner restriction must also be narrowly tailored to promote the government's interest. *MacDonald*, 243 F.3d at 1032. A regulation is narrowly tailored as long as the government interest it promotes "'would be achieved less effectively absent the regulation.'" *Graff v. City of Chicago*, 9 F.3d 1309, 1321 (7th Cir. 1993) (quoting *Ward*, 491 U.S. at 799)). Essentially, the means chosen cannot be "substantially broader than necessary to achieve the government's interest," but a regulation is not invalid because "the government's interest could be adequately served by some less-speech-restrictive alternative." *Graff*, 9 F.3d at 1321 (citing *Ward*, 491 U.S. at 800). For example, in *Potts v. City of Lafayette*, the Seventh Circuit upheld an order

prohibiting people from bringing "personal items which could be used as weapons" into a Ku Klux Klan ("KKK") rally, finding, in relevant part, that the means employed in the order were not "substantially broader" than necessary to achieve the government's interest. 121 F.3d 1106, 1109, 1111-12 (7th Cir. 1997). The plaintiff in *Potts*, who was not a journalist, was prohibited from entering the rally with a tape recorder intended for research purposes. *Id.* at 1109. The court found that the government's goal—to prevent violence and injury at the KKK rally—would have been achieved less effectively without the order, which did contain an exception for members of the press who needed to bring reporting equipment to the rally. *Id.* at 1112. Although personal items that were not intended to injure anyone or cause violence fell within the scope of the order, the Seventh Circuit did not find the order broader than necessary, given that prohibiting people from carrying objects of such a size and weight that could cause injury to others did in fact diminish the likelihood that injury would occur. *Id.*

Defendant argues that the Ordinance in this case is likewise narrowly tailored. The Ordinance only applies to "special events," in other words, events that require special services. WINNETKA VILL. CODE § 5.66.010. Thus, Defendant insists, the Ordinance comes into play in the first instance only if the person or organization holding an event desires to have or requests special services at an event or if the event eventually requires special services. Because it only encompasses instances where the event host chooses to request special services or those events that actually end up requiring special services, the Village argues, the Ordinance *only* reaches instances where, without the Ordinance, the Village would be absorbing the cost of special services and thereby compromising the public health, safety, and welfare as described above. Plaintiff has not shown that this language is, as a matter of law, "substantially broader than is necessary." *Graff*, 9 F.3d at 1321.

Nor has Plaintiff established that the Ordinance is "substantially broader than necessary" because it allows the denial of a permit where the event would cause one of the listed disruptions.

The Ordinance directs that a permit will be denied only if there are not significant Village resources available at the time of the proposed event to mitigate the disruption. WINNETKA VILL. CODE §§ 5.66.040(J)(6)-(7). This additional requirement ensures that the Ordinance remains narrowly tailored to the Village's significant interest in preserving the Village's health, safety, and welfare. Finally, the Ordinance provides the Village Manager with the authority to waive fees and other requirements if the event has a minimal impact on Village services such that complying with the requirements would impose an undue burden on the applicant and the 10% administrative fee would not even cover the cost of processing the application. *Id.* § 5.66.040(K). This provision confirms the Ordinance's narrow tailoring to the Village's interest by giving the Village Manager the authority not to impose the Ordinance's restrictions when the need for Village services is so slight that it would not impact that Village's ability to otherwise preserve its resources to serve the public health, safety, and welfare of the Village as a whole.

As noted earlier, the Ordinance authorizes the Village to charge a resident for special services in instances where she did not request such services but they became necessary. (*See supra* Discussion, Section B.1.) Even if this does occur, however, the court would not conclude Plaintiff is entitled to summary judgment on the ground that the Ordinance is not narrowly tailored. If the Village is not aware of the special services required beforehand, it is true that the Ordinance will not achieve the purpose of promoting public safety by maintaining the normal use of public ways. In every case, however, the Ordinance ensures that the Village does not have to absorb the costs of special services, which affects its ability to preserve and allocate resources in the interest of the health, safety, and welfare of the Village as a whole. The fact that the Village effectively doubles the fee in situations where the Village is not made aware of the need for services in advance is troublesome. Plaintiff has not raised an argument that such an increased fee is not narrowly tailored to the Village's interests; the court would, however, entertain such an argument on a renewed motion.

Finally, a valid time, place, and manner regulation must leave open alternative channels for communication. *See MacDonald*, 243 F.3d at 1032. In other words, the channels of communication that are still available in light of the prohibited activity must be both "ample and adequate." *City of Watseka v. Ill. Pub. Action Council*, 796 F.2d 1547, 1553 (7th Cir. 1986). Plaintiff argues that the Ordinance grants no alternative channels of communication, and that certain events may be banned altogether with no recourse. (Pl. Mot. for SJ at 10.) Defendant does not address Plaintiff's point directly but emphasizes that the procedures established by the Ordinance do not constitute a process to seek permission from the Village to hold an event; they are, rather, merely a mechanism for "standardizing the circumstances under which individuals will be allowed to use the Village's services." (Def. Opp'n to SJ at 9.)

Plaintiff's primary contention is that the Village "has granted itself the authority to ban completely events that may disrupt traffic or interfere with Village services." (Pl. SJ Reply at 12.) Plaintiff is correct that the Ordinance allows the Village to deny a permit for certain specified disruptions, but the Ordinance does not by its terms give the Village unlimited discretion to do so. Instead, the Ordinance directs that such a decision be made only when there are insufficient Village resources available "at the time of the proposed event" to mitigate the disruption that would be generated by the event. WINNETKA VILL. CODE §§ 5.66.040(J)(6)-(7). Plaintiff observes that certain events, those "likely to draw heavily upon Village resources or cause traffic concerns no matter when they are held, such as a march for an unpopular cause or a fundraiser for a presidential candidate, may be banned entirely from the Village." (Pl. SJ Reply at 12.) In the court's view, that Winnetka resident Patrick Ryan hosted a fundraiser for President Bush in 2004 that consumed 899.25 man-hours of police protection, shows the capacity of the Village to handle an immense amount of services in conjunction with special events. Indeed, for the Bush fundraiser, the Village of Winnetka orchestrated the necessary services for the event, engaging dozens of other local police departments. (Ex. 10A to Def. LR 56.1 Stmt.)

38

In any case, even assuming the extreme that Plaintiff presents—that a situation could arise where there would never be, at any time, sufficient Village resources available to mitigate the disruption—the court is not prepared to conclude the Ordinance is invalid as a matter of law. Plaintiff is not prevented from using traditional public fora such as the streets, sidewalks, and parks at any time or place, in whatever manner he chooses, and for any speech he chooses, as long as he is in conformity with any other Village ordinances. Indeed, it is undisputed that the special event permit requirements have never been applied to parades, and Plaintiff is deemed to have admitted that the Ordinance does not apply to public demonstrations. (Pl. LR 56.1 Resp. ¶ 24.) The only restriction the Ordinance imposes then is that Plaintiff may not be granted the assistance of special services provided by the Village in his exercise. While the inability to obtain Village services could potentially alter the nature of Plaintiff's exercise of his First Amendment rights, an alternative is not inadequate because it is not the speaker's "first or best choice" or because it does not provide "the same audience or impact for the speech." *See Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000) (citations omitted); *see also Ward*, 491 U.S. at 797 ("[O]ur cases quite clearly hold that restrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'") (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)).

Plaintiff claims otherwise, comparing the Ordinance to the one at issue in *MacDonald*. The ordinance there authorized the Commissioner to deny a permit for a parade or other public assembly on a public street or sidewalk if traffic hazards were too great and police protection was insufficient for that time and place. 243 F.3d at 1033. If the City denied a permit on such grounds, the ordinance required the City to authorize an event comparable in visibility, route, location, and date to the of the proposed event. *Id.* The *MacDonald* court relied on this provision in finding that ample alternative channels of communication were available. *See id.* at 1034. This case is distinguishable from *MacDonald*. The ordinance at issue in *MacDonald* prohibited individuals from

holding a parade, assembly, or athletic event on public property without being granted a permit to do so. The Ordinance at issue here does not on its face prohibit a resident from holding any event he or she wishes; the resident simply will not be provided Village services for the event. The inability to obtain special services necessary for a private event does not bar any expression in public fora. The court concludes that Plaintiff is not entitled to summary judgment on this issue.

### b. Absence of Provision for Fee Waiver for Indigency

In discussing the validity of the Ordinance as a time, place, and manner regulation Plaintiff mentions, in one brief sentence, that the Ordinance has no provision for waiving the fee for the indigent. (Pl. Mot. for SJ at 11.) It is not entirely clear to the court whether Plaintiff contends that the lack of a waiver provision limits alternative channels of communication or that the lack of a fee waiver provision in and of itself is sufficient to render the Ordinance unconstitutional. Defendant responds that the Ordinance authorizes the Village manager to reduce or waive fees in specified circumstances and that the applicant has a right to a prompt appeal to the Village council regarding the amount of the user fee or supplemental fee. (Def. Opp'n to SJ at 9.) The Ordinance does contain a provision that permits the Village Manager to "reduce or waive fees in certain [specified] instances." WINNETKA VILL. CODE § 5.66.040(K). The most relevant such instance is when the event would have a minimal impact on the Village's services such that requiring the applicant to comply with all of the Ordinance's requirements would be an undue burden and the 10% administrative fee would be so low that it would not cover the Village's costs in processing the application. Defendant has not suggested that this provision provides a waiver for those unable to pay, however. Nor is the provision authorizing an appeal to the Village council of "the amount of the user fee or supplemental user fee" tantamount to a fee waiver for the indigent. *Id.* § 5.66.040(L). While it may be the case that the Village Council would waive a fee on account of an individual's inability to pay, nothing in the Ordinance makes this explicit.

As the court understands Plaintiff's argument, he has raised the matter of a waiver of fees for indigency because Defendant, at various points, mentioned that individuals or groups are free to obtain services, such as security, privately, in lieu of services from the Village. Such an alternative would presumably be unavailing for an indigent person. The absence of a fee waiver for indigency nevertheless does not trouble the court. In finding ample alternative channels of communication, the court did not rely on the fact that individuals may privately arrange for special services instead of applying for a special event permit under the Ordinance; rather, the court relied on the fact that the Ordinance does not prevent Plaintiff from using traditional public fora for any speech he chooses without the assistance of special services. In the court's view, it is also possible that Plaintiff is claiming that the lack of a fee waiver provision independently renders the Ordinance unconstitutional because it may infringe on the exercise of First Amendment rights by preventing individuals who cannot afford the fee from conducting special events, or may chill the exercise of rights by those who fear that special services may become necessary at an event for which they did not obtain a permit in advance, resulting in the *post-hoc* imposition of a prohibitive fee. The court considers this argument here.

### 1.    Constitutionality of Permit Fees

It is well-established that the Constitution allows permit schemes that impose a fee dependent upon the expense of the act licensed. *See Cox v. N.H.*, 312 U.S. 569, 576-77 (1941); *Church of Am. Knights of Ku Klux Klan v. City of Gary*, 334 F.3d 676, 682 (7th Cir. 2003). In *Cox*, the plaintiffs challenged a state statute that required individuals to obtain a license before conducting, among other activities, parades or processions on public streets or ways or public meetings on public property. *Id.* at 571. The license fee, ranging from a nominal amount to $300, varied with the public expense of policing the particular event. *Id.* at 566-67. In upholding the fee system, the Supreme Court acknowledged that the fee was "to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed" and that

"[t]here is nothing contrary to the Constitution in the charge of a fee limited to the purpose stated." *Id.* at 577.

The Seventh Circuit disapproved of a fee system in *Church of American Knights of Ku Klux Klan* when the fee imposed was not a cost-based one. 334 F.3d at 682. The City of Gary's permit and parade ordinance required that if an applicant for a permit had a history of engaging in unlawfully violent conduct, the Chief of Police would use his best judgment to determine the cost to the City for providing police protection to prevent harm to persons or property; the applicant had to pay the fee before the permit was granted. *Id.* at 679. The City's lawyer acknowledged that a substantial but peaceful demonstration would cost the City at least three times more than a small KKK rally yet no fee would be charged. *Id.* at 681-82. The court concluded that it was apparent "that the requirement of the fee [was] not based on a concern with the burden on public services that parades and other open-air assembles impose--a concern that would be entirely legitimate and would permit the charging of a cost-based fee." *Id.* at 682.

## 2. Fees Potentially Impacting First Amendment Rights

Whether fee waiver provisions for the indigent are required whenever a fee scheme might impact First Amendment rights might be a closer question. The only binding authority that Plaintiff cites on this issue, however, is *Lubin v. Panish*, 415 U.S. 709 (1974),[25] which involved a mandatory filing fee for candidates running for public office; the fee was held unconstitutional because it absolutely precluded candidates unable to pay the fee from accessing the ballot and no alternative means of ballot access were available. *Id.* at 718. As established above, an inability to pay for

---

[25] The other case Plaintiff cites, *Collin v. Smith*, only marginally deals with a fee waiver and does not mention that the waiver is for the indigent. 447 F. Supp. 676, 685 (D.C. Ill. 1978). Significantly, *Collin* includes language that approves of financial burdens on the exercise of First Amendment rights, such as permit fees, as long as the amount is "reasonable and directly related to the accomplishment of legitimate governmental purposes." *Id.* (citations omitted).

special services does not preclude the exercise of First Amendment rights in this case; public fora remain open for the exercise of First Amendment rights in manners that do not require special services. In this respect, this case is more similar to *Stonewall Union v. City of Columbus*, 931 F.2d. 1130 (6th Cir. 1991). In *Stonewall Union*, the Sixth Circuit considered the constitutionality of a parade permit Ordinance that did not provide a fee waiver for the indigent. *Id.* at 1137. Because alternative fora for related speech activities were available without cost, the court upheld the permit fee against a First Amendment challenge. *Id.* The absence of a fee waiver does not require entry of judgment in favor of Plaintiff.

### c. Administrative Standards

In addition to arguing that the Ordinance's alleged lack of administrative standards enables viewpoint discrimination, Plaintiff also contends that the discretion given to Village administrators is alone enough to render the Ordinance unconstitutional on its face. (Pl. Mot. for SJ at 12-14.) Plaintiff is correct that even a content-neutral time, place, and manner regulation can unconstitutionally limit expression if the administrative official enjoys unfettered discretion in determining whether to grant or deny a permit. *See Thomas*, 534 U.S. at 323. The Ordinance must provide "narrowly drawn, reasonable and definite standards to guide the licensor's determination." *Id.* at 324 (internal quotations and citations omitted).

Plaintiff argues that the Ordinance allows Village administrators to make subjective determinations as to what Village resources are warranted. (Pl. Mot for SJ at 13.) Further, Plaintiff argues, the Ordinance fails to define when a disruption or interference is "substantial" or "unnecessary," granting Village administrators unfettered discretion to deny a permit. (*Id.* at 14.) Finally, Plaintiff contends that the Ordinance "actually requires and encourages the Village administrators to judge the subjective worth of the event to the community" by empowering the Village to waive permit requirements and fees when the Village Manager finds, among other factors,

43

that an event "will encourage the economic development of the Village, provide safe activities for the children of the community, promote citizen involvement or otherwise benefit the health, safety or welfare of the Village and its citizens." (*Id.*) WINNETKA VILL. CODE § 5.66.040(J)(9).

Defendant argues that the Ordinance has "extensive objective standards that inform everyone of when a permit is required and when it is not required." (Def. Opp'n to SJ at 9.) Defendant notes that the Ordinance sets up a process by which the Village administrators familiar with the different types of special services requested (i.e. the Fire Chief, Public Works Director and Water and Electric Director) each receive a copy of the application and estimate the Village services necessary. *See* WINNETKA VILL. CODE § 5.66.040(C)(3). The Ordinance does reserve the right to assign additional services to the event above and beyond those "specifically requested by the applicant" if Village administrators determine such services are warranted. *See id.* § 5.66.050. But the Village argues that its interpretation of this provision confirms that such a decision is based only on objective factors—the services requested by the applicant and the number of attendees projected by the applicant, (*see supra* Factual Background, Section C.). *See Forsyth County*, 505 U.S. at 131; *Ward*, 491 U.S. at 795-96.

Plaintiff compares the discretion granted to Village officials under the Ordinance to that of the administrator responsible for implementing the assembly and parade ordinance in *Forsyth*. The court does not find this comparison persuasive. In *Forsyth*, the court considered how the county interpreted and implemented the ordinance at issue and found that it was completely left to the whim of the administrator whether "the fee would include any or all of the county's administrative and security expenses." *See* 505 U.S. at 131. Further, the administrator in *Forsyth* "based the fee on his own judgment of what would be reasonable." *See id.* at 132. In contrast, the Ordinance in this case fixes the specific manner in which the fee for each type of special service is to be

determined so as to accurately represent the cost of the service plus an administrative fee. *See* WINNETKA VILL. CODE § 5.66.050.

Plaintiff also notes the Ordinance's failure to define when a disruption or interference is "substantial" or "unnecessary," which, according to Plaintiff, grants Village administrators improper discretion to deny a permit. (Pl. Mot for SJ at 14.) The court need look no further than *MacDonald* to find that a lack of definition for these terms does not grant unbridled discretion. In *MacDonald*, the plaintiff argued that the ordinance granted the Commissioner complete discretion to grant or deny a permit because it allowed him to consider, for example, whether the parade proposed would "substantially or unnecessarily interfere with traffic" near the route or if there were "sufficient" resources to mitigate the disruption. 243 F.3d at 1026. The *MacDonald* court found that the ordinance narrowly identified the governmental concerns, which included traffic flows, traffic hazards, and emergency transportation. *Id.* at 1027. The Ordinance in this case similarly narrowly defines the government concerns: those listed include interference with access to the fire station or fire hydrants, interference with access to businesses or residences in the immediate vicinity of the event, and interference with police, fire, water, electric, public works or other Village services. *See* WINNETKA VILL. CODE §§ 5.66.040(K)(6)-(7). The *MacDonald* court also held that words such as "substantially," "unnecessarily," and "sufficient" actually serve as an additional limitation on discretion. 243 F.3d at 1028; *see Thomas v. Chicago Park Dist.*, 227 F.3d 921, 925 (7th Cir. 2000), *aff'd*, *Thomas*, 534 U.S. 316 (stating that the "residual vagueness" imposed by the word "material" could be resolved "only by eliminating it from the regulation, but that would make the regulation more rather than less restrictive"). Such words similarly limit discretion in this case and, while they may grant some flexibility to Village administrators, the court finds that it is "no more than is necessary so as to allow the city officials to balance the competing interests at issue." *Id.* at 1029.

Plaintiff's final contention regarding the Ordinance's alleged lack of administrative standards is that the Ordinance grants too much discretion to the Village Manager by giving him the authority to waive permit requirements and fees when the Village Manager finds that: (i) the event is "open to the general public;"(ii) the event is "sponsored by an organization that is located in and serves the residents or businesses of the Village;" and (iii) that the event "will encourage the economic development of the Village, provide safe activities for the children of the community, promote citizen involvement or otherwise benefit the health, safety or welfare of the Village and its citizens." (Pl. Mot. for SJ at 14.) WINNETKA VILL. CODE § 5.66.040(J)(9). Though Defendant argues that the Ordinance has sufficient objective standards, Defendant does not discuss this particular provision in its response. (Def. Opp'n to SJ at 9.) The court has serious concern that this waiver provision could be exercised in viewpoint-discriminatory manner.

If viewed in three parts, the first two parts of the waiver provision leave no discretion to the Village Manager. The requirements that the event must be open to the general public and must be sponsored by an organization that is located in and serves the residents or businesses of the Village are sufficiently objective to guide the Village Manager's decision in granting a waiver. *See Thomas*, 534 U.S. at 323.

The court is troubled, however, by the third requirement, which appears to leave the waiver of the Ordinance or the requirements "to the whim" of Village officials. *See Thomas*, 534 U.S. at 324. No definite standards are provided from which to judge whether a particular event "will encourage the economic development of the Village, provide safe activities for the children of the community, promote citizen involvement or otherwise benefit the health, safety or welfare of the Village and its citizens." WINNETKA VILL. CODE § 5.66.040(J)(9); *see Thomas*, 524 U.S. at 324 (grounds for denying a permit must be "narrowly drawn, reasonable and definite") (citation and internal quotations omitted). As a result, the provision, as written, appears to allow the Village

Manager to decide for him or herself what events are and are not in the interest of the "health, safety, and welfare of the Village and its citizens," and what events will or will not "promote citizen involvement." WINNETKA VILL. CODE § 5.66.040(J)(9).[26]  In the court's view, affording this degree of discretion to the Village Manager could, in effect, enable the Village to favor or disfavor events based on their content through the mechanism of a waiver.

In *Thomas*, the court stated that "[g]ranting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional." 534 U.S. at 325.  The provision at issue in *Thomas* listed numerous grounds on which the Park District "may" deny a permit.  *Id.*  The party challenging the ordinance argued that the use of the word "may" amounted to a discretionary waiver provision that could be used to favor or disfavor speech.  *Id.*  The court disagreed that such rigidity in wording was required and actually found the language as it existed to further, rather than constrict, free speech.  *Id.*  In the end, the *Thomas* court opted to wait to address the waiver issue "if and when a pattern of unlawful favoritism appears."  *Id.*  Unlike in *Thomas*, the provision allowing a waiver here is explicit.  But, because the court has yet to hear from Defendant on the operation of this provision, the court declines to rule on its constitutionality at this time; if, however, Defendant is unable to demonstrate that § 5.66.040(J)(9) does permit viewpoint-discrimination, the court will be inclined to sever this provision from the Ordinance and grant summary judgment in favor of Plaintiff on this provision.

--------

[26]  In *Shuttlesworth v. City of Birmingham*, the Supreme Court discussed similar language.  *Shuttlesworth* involved an ordinance that authorized the Birmingham City Commission to issue permits for parades or processions unless, in the City Commission's judgment, "the public welfare, peace, safety, health, decency, good order, morals or convenience require[d] that it be refused." 394 U.S. 147, 149-50 (1969).  The Court's discussion occurred in the context of whether a conviction secured under the ordinance was valid, thus the Court assumed that the ordinance would pass constitutional muster as a result of a limiting construction imposed by the Supreme Court of Alabama.  *Id.* at 154-55.  But, the court noted that as the ordinance was written, without the limiting construction, it conferred "virtually unbridled and absolute power" on the members of the City Commission who "were to be guided only by their own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience.'"  *Id.* at 150.

### 3.    Private Activity

The principle that "[a] special respect for individual liberty in the home has long been a part of . . . [the] law" has "special resonance when the government seeks to constrain a person's" speech in his or her home.  *See City of Ladue v. Gilleo*, 512 U.S. 43, 58 (1994) (citation omitted). Based on this well-accepted principle, Plaintiff contends that the Ordinance is unconstitutional because it impermissibly restricts private First Amendment activity.  (Pl. Mot. for SJ at 11-12.)  More specifically, Plaintiff argues that the Ordinance grants the Village the power to forbid events in private residences entirely, and that there is "no alternative channel of communication equivalent to private political speech and activity in one's home." (*Id.* at 12.)  The court concludes that Plaintiff has not established the absence of a dispute of fact on this issue.

Plaintiff is correct that the Ordinance applies to "special events" whether or not they are on public or private property.  WINNETKA VILL. CODE § 5.66.020.  The court does not agree, however, that the Ordinance prevents events on private property from occurring entirely or enables the "strict and categorical regulation of private events." (Pl. Mot. for SJ at 11.)  As discussed at length earlier in this opinion, to the extent the Ordinance limits any events, it only limits the availability of special services for an event and does not prohibit an event from otherwise occurring.   Individuals or groups are free to hold any otherwise legal event on private property as long as it does not require special services.  To the extent Plaintiff claims that the Ordinance infringes on expression because some events cannot be held without special services and the fee requirement itself infringes on expression or prevents those who cannot afford services from obtaining them, the court does not believe that the record supports summary judgment in favor of Plaintiff.  Defendant asserts that Plaintiff's expectation that the Village will provide special services free of charge to facilitate an event on private property is equivalent to an expectation that the Village must subsidize Plaintiff's private First Amendment activity.  The notion that the government's decision "not to subsidize the

exercise of a fundamental right does not infringe on the right" is a well-accepted one. *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 549, (1983) (citation omitted). Plaintiff has not substantiated that the Village has a constitutional obligation to do so here. Put another way, he has not satisfied the court that he is entitled to summary judgment on his claim that, where the Secret Service or other security requirements impose substantial cost on a community for a privately-sponsored event, the community violates the First Amendment by attempting to recover that cost from the event host.

## CONCLUSION

For the reasons explained above, Defendant's motion to strike (37) is granted in part and denied in part. Defendant's motion to dismiss (24) is denied. Plaintiff's motion for summary judgment (17) is denied.

ENTER:


Dated: March 15, 2007

_____

REBECCA R. PALLMEYER
United States District Judge