# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM A. BRANDT, JR., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 06-cv-588 |
| | ) | |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr., |
| THE VILLAGE OF WINNETKA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

In this case, Plaintiff William A. Brandt, Jr. ("Plaintiff" or "Brandt") challenges the constitutionality of an ordinance enacted by Defendant Village of Winnetka ("Defendant" or "Village") pursuant to which the Village seeks to recoup costs that it incurs providing services to residents who host private events at which the guest of honor is a political figure who requires a high degree of security. In his operative second amended complaint, Plaintiff contends that the ordinance in question violates the First Amendment (Count I) and the Fourteenth Amendment (Count II) of the Constitution of the United States. Currently before the Court are Plaintiff's motion for summary judgment [85] and Defendant's motion for summary judgment [88]. For the reasons stated below, the Court denies Plaintiff's motion [85] and grants Defendant's motion [88] because, on the record before the Court, there is no live case or controversy over which the Court properly may exercise subject matter jurisdiction under Article III of the Constitution.

## I. Background

### A. Procedural Background

Plaintiff filed his first amended complaint in this action on February 28, 2006. Plaintiff followed, shortly thereafter, with a summary judgment motion on his facial challenge to the

validity of Chapter 5.66 of the Winnetka Village Code (the "Ordinance"). At approximately the same time, Defendant countered with a motion to dismiss the first amended complaint for lack of standing and on the merits. Judge Pallmeyer, to whom this case was originally assigned, issued a memorandum opinion on March 15, 2007, in which she denied both motions. After Judge Pallmeyer denied Plaintiff's motion to certify two issues for interlocutory appeal on November 7, 2007, the case was reassigned to this Court. By the time that Plaintiff filed his second amended complaint, the Ordinance had been amended twice, in April and September of 2007. Plaintiff restated his claim that the Ordinance violates the First Amendment, but now has substituted an "as applied" challenge in place of the earlier "facial" challenge. In addition, Plaintiff's second amended complaint added a second count alleging a violation of his procedural and substantive due process rights under the Fourteenth Amendment. After attempts to settle the case failed, the parties filed the cross-motions for summary judgment that currently are pending before the Court.

### B. Factual Background[1]

William Brandt, Jr. is a resident of the Village of Winnetka, a municipality in the state of Illinois. Pl. SOF ¶ 1; Def. SOF ¶ 1. Brandt and his family have been interested and active in political affairs on the local, state and national level for many years. Pl. SOF ¶ 2. Over the years they have hosted political fundraisers for federal and state candidates and other events at Plaintiff's home in Winnetka. PL. SOF ¶ 3; Def. SOF ¶ 1. Brandt holds these events not only to

---

[1] Defendant objects to a substantial number of Plaintiff's statements of material fact, but the Court need not delve deeply into Defendant's objections or Plaintiff's responses to those objections because the facts that are relevant to the disposition of the motions currently before the Court are few in number and essentially undisputed. Many of the disputed statements of fact pertain to the application of the Ordinance in the abstract. The dispositive issue, however, is narrowly focused on whether the Ordinance ever has been or is likely to be applied *to Plaintiff*. The fact statements omitted from this section are not material to the Court's ultimate determination that there is no justiciable controversy on the record before the Court.

2

raise money, but also to provide candidates with a forum to convey their political message. Pl. SOF ¶ 4. Some of these events have featured candidates and officeholders with official security details or other public figures with security requirements. *Id*. ¶ 6. The security details may require the allocation of policing resources, the closing of streets or other public areas, and the deployment of other municipal resources. *Id*. ¶ 8.

When the President, the First Lady, or a Presidential candidate has been invited to appear at an event in the Village, the Secret Service[2] has contacted the Winnetka Police Department to request security and related services. Pl. SOF ¶ 8; Def. SOF ¶ 42. The hosts of political events have no control over what safety requirements will be necessary or what demands official security details may place on a municipality because the security attachments do not discuss security plans with a host before an event. Pl. SOF ¶¶ 12, 14. The Winnetka Chief of Police is not aware of any legal mandate that the Village provide resources to the Secret Service. Pl. SOF ¶ 46. However, the Village accommodates the Secret Service's requests whenever possible, and has never refused to provide services requested by the Secret Service. *Id*. ¶ 47.

In 1996, Brandt hosted two fundraising events in his private residence, one attended by President Bill Clinton, the other by First Lady Hillary Clinton. Pl. SOF ¶ 16. Following those two events, the Village billed the Democratic National Committee ("DNC") to cover the costs incurred by the Village to provide a special police detail. *Id*. ¶ 17. The DNC was billed $10,831 for the event attended by President Clinton and $2,516 for event that Hillary Clinton attended. *Id*.

President Clinton's 1996 visit prompted the Village to discuss creating a special events ordinance, the goal of which, as first enacted, was cost recovery for providing services. Pl. SOF

---

[2] Sitting Presidents and Presidential nominees, travel with extensive United States Secret Service ("Secret Service") security details. Pl. SOF ¶ 7.

¶ 21. That ordinance became Chapter 5.66 of the Winnetka Village Code, which initially was enacted in November of 2000. *Id.* After Plaintiff filed his original complaint in this action, the Winnetka Village Council amended the Ordinance twice. *Id.* ¶ 23. In its current form, the Ordinance's "Statement of Policy" provides that "[i]t is therefore the policy of the Village that any person who holds or sponsors an event that requires the Village to provide special services shall pay the Village's costs of providing such special services. It is also the policy of the Village that the allocation of the Village's resources and the setting of fees and charges for their use for special events shall be done pursuant to content neutral standards and procedures." Def. SOF ¶ 32. The term "Special Event" is defined as "an activity on public or private property that is not sponsored in whole or in part by the Village of Winnetka and that requires the Village to provide special services." Pl. SOF ¶ 25. The Ordinance defines "Special Services" as follows:

> As used in this chapter, "special services," means the exclusive allocation of Village resources, including but not limited to Village personnel, equipment, rights-of-way or property, for use in conjunction with a specific event or activity, as requested by the host or sponsor of the event, *or as requested by or on behalf of any person attending the event*. Special services shall include, but not be limited to, any of the following: street closures; requiring police officers to stop or reroute traffic; special police protection; stationing emergency vehicles at or in the immediate vicinity of the event; exclusive use of the Village streets as a staging area or for event parking; additional street cleaning and garbage removal services; special signage, such as temporary no parking signs; the use of any Village building, equipment or other property for any purpose other than the normal daily operations of the Village; and otherwise providing exclusive services.

Def. SOF ¶ 33; Pl. SOF ¶ 26 (emphasis added). "Special services" may include requests by the Secret Service or other law enforcement personnel even if the request is made directly to the Village and without the knowledge or approval of the host of the event, in which case the cost of services provided still is to be billed to the host. Pl. SOF ¶¶ 49-50.

4

The Ordinance further requires that "No person shall conduct a special event without first having obtained a special event permit from the Village" and defines the form and content of special event permit applications, establishes review procedures, sets out standards for the review and issuance of permits, reserves certain rights to the Village, delineates the authority of the Village Manager, and provides for decisions on permit denials, revocations, and fees to be appealed to the Winnetka Village Council. Def. SOF ¶ 35. Permit applications "shall be delivered to the Chief of Police no less than fifteen (15) days prior to the proposed special event." Pl. SOF ¶ 27. The permit application must include "[a] description of the special event, including the street address of the event location, the date, time and duration of the event. *Id*. ¶ 28. The Ordinance delineates the "Content of Application," which must include a "statement signed by the applicant either agreeing to pay all fees and meet all other requirements of this chapter, or representing to the Village that the applicant is duly authorized to make such agreement on behalf of the person or organization holding or sponsoring the special event." Def. SOF ¶ 36; Pl. SOF ¶ 29.

The Ordinance includes provisions for Fees and Charges. "If the permit application is not submitted at least 15 days before the event, a non-refundable late fee of $250.00 shall be added to the application processing fee. The late fee shall not be credited against the user fee." Pl. SOF ¶ 38. "Upon completion of the special event, the Village shall prepare a detailed account of all special services provided for the special event and shall set the final user fee using the rates, fees and charges established as provided in this Chapter, plus a ten percent (10%) non-refundable administrative fee. The Village shall provide the authorized and responsible person identified in the application with a copy of the detailed account of services and an invoice for the user fee, less the fee deposit." *Id*. ¶ 36. "Special event" permit fees are set by action of the

5

Winnetka Village Council, which has incorporated some fees into the Ordinance and sets other fees in its annual fee resolution. Def. SOF ¶ 45.

The Ordinance concludes with a section on Violations and Penalties. It provides that "[a]ny person who violates any provision of this chapter, who makes a false statement in obtaining a permit under this chapter, or who violates any condition of any permit issued under this chapter, shall be subject to the penalties provided in this chapter in addition to the general penalties established in Chapter 1.08 of this code (providing for penalties up to $750); provided that the penalty for holding a special event without submitting a completed permit application and paying the required deposit at least (5) days before the special event shall be a fine of not less than $1,000." Pl. SOF ¶¶ 39, 41.

Since the Ordinance was enacted in November 2000, Brandt has had "innumerable senators and congress people" visit his home in connection with fundraising events, has never applied for a special permit, and has never been billed by the Village for the provision of special services. Def. SOF ¶¶ 5, 48, 59-60. He also has hosted various Illinois political figures, as well as mayors and governors from other states, and show business personalities, including Ray Charles, the Beach Boys. and Harrison Ford. Def. SOF ¶ 49. In August 2005, Brandt hosted a fundraising event in his home for Senator Hillary Clinton, who attended with a security detail of Secret Service and Capitol Hill Police. Def. SOF ¶ 53. Brandt did not request any Village resources or contact any Village officials with respect to that event. Def. SOF ¶¶ 54-55. The Secret Service did not request any services from the Village. Pl. SOF ¶ 76. The Ordinance had no impact on Brandt's decision to host Hillary Clinton. Def. SOF ¶ 56. Brandt hosted a major fundraiser for Congressional candidate Tammy Duckworth in late February or early March of 2006, and has since held fundraisers for Congresswoman Jan Schakowsky, Illinois Attorney

General Lisa Madigan and Senator Al Franken. Def. SOF ¶ 57. Brandt planned to host an event in 2008 for then-Presidential candidate Hillary Clinton, but that event was cancelled when Clinton did not receive the Democratic nomination for President. Pl. SAF ¶ 6.

Brandt intends to host other politicians in the future, including candidates for President of the United States, but he acknowledges that "there are only 10 or 15 people who warrant" Secret Service or Capitol police security demands and that the Ordinance is not going to stop or interfere with "the average flotsam and jetsam of House or Senate members." Def. SOF ¶ 3; Pl. SOF ¶ 5. Plaintiff nonetheless contends that because of the Ordinance, he is less willing to host future political and fundraising events. Pl. SOF ¶ 77.

Other Village residents have received bills under the Ordinance after events attended by politicians. When President Bush attended a private fundraising meeting at the home of Patrick Ryan on July 24, 2004, the Village needed approximately 150 police officers to provide the requisite security for the event. Def. SOF ¶ 8. The Secret Service contacted the Village approximately seven days before the event. Def. SOF ¶ 9. The Village became responsible for coordinating all local police protection resources for the Ryan event. Def. SOF ¶ 10. The Village's responsibilities extended through Northfield to the border of Glenview, with the Village providing the motorcade once the Presidential contingent reached Waukegan Road, which involved about 50 squad cars. Def. SOF ¶ 11. The Village had to inspect and seal approximately 57 separate sewer caps along the motorcade route for Bush's visit. Def. SOF ¶ 14. The Ryan event required a maximum effort of the Winnetka Police Department; in addition to the four officers who were on regular duty to serve the entire Village, the Police Department had to call in about 22 other Winnetka police officers, cancelling their days off or working on overtime in order to accommodate President Bush's visit to Mr. Ryan's house. Def. SOF ¶ 19.

Ryan was not alerted by Village officials that he would be billed for services provided by the Village during the event. Pl. SOF ¶ 56. He was billed $75,333.67 for the event and the Republican National Committee ("RNC") paid the invoice. Def. SOF ¶¶ 23, 28; Pl. SOF ¶ 54.

Ryan also was billed $6,585 for services provided by the Village in connection with a 2004 event at his private residence attended by First Lady Laura Bush. Pl. SOF ¶ 57. Edgar Jannotta, a Winnetka resident, was billed $2,518.50 for Village services provided during a May 3, 2004 event at his private residence attended by First Lady Laura Bush. Pl. SOF ¶ 59. Village officials did not speak with Ryan or Jannotta before the events. Pl. SOF ¶¶ 58, 60.

Brandt is not aware of anything that would prohibit either the DNC or RNC from agreeing to bear these expenses. Def. SOF ¶ 21. Nor is he aware that anything prohibits the individual president's or presidential candidate's campaign funds from making the reimbursement. Def. SOF ¶ 22.

## II. Legal Standard on Summary Judgment

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Id*. at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III. Analysis

A federal court always "has an obligation to satisfy itself that federal subject matter jurisdiction exists before proceeding to the merits in any case." *Smith v. Am. Gen. Life and Accident Ins. Co., Inc.*, 337 F.3d 888, 892 (7th Cir. 2003) (citations omitted). It is axiomatic that federal courts are courts of limited jurisdiction. As the Seventh Circuit has explained, federal courts "have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Transit Express v. Ettinger*, 246 F.3d 1018, 1023 (7th Cir. 2001). "Article III, § 2 of the Constitution limits the 'judicial power' to the resolution of 'cases' and 'controversies.'" *Indiana Right to Life, Inc. v. Shepard*, 507 F.3d 545, 549 (7th Cir. 2007) (quotations omitted). Where, as here, the parties seek a declaration as to the constitutionality of an ordinance, the court must ask "whether the facts alleged under all the circumstances show that there is a substantial controversy between the parties having adverse legal interests of *sufficient immediacy and reality* to warrant the issuance of a declaratory

judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (emphasis added). Under Article III, a court may not address claims "if they are grounded on contingent future events that may not occur as anticipated, or indeed may not occur at all." *Corey H. v. Bd. of Educ. of City of Chicago*, 534 F.3d 683, 689 (7th Cir. 2008).

An Article III case or controversy requires a claim that is ripe and a plaintiff who has standing. See *Indiana Right to Life, Inc.*, 507 F.3d at 549. Although typically distinct questions, standing and ripeness tend to converge in cases, such as this one, that involve pre-enforcement challenges. See *Elend v. Basham*, 471 F.3d 1199, 1205 (11th Cir. 2006) ("if an action for prospective relief is not ripe because the factual predicate for the injury has not yet fully materialized, then it generally will not contain a concrete injury requisite for standing"); *Kegler v. United States Dep't of Justice*, 436 F. Supp. 2d 1204, (D. Wyo. 2006) ("One can easily imagine a case wherein an arguably anticipated, but nevertheless remote injury might be disposed of on either ground; a personal stake in the outcome (standing) is directly limited by the maturity of the harm (ripeness)"). Regardless of the lens through which Plaintiff's claim is viewed, this Court is obliged to dismiss a case if on the record before it any injury to Plaintiff is entirely hypothetical and therefore fails to present a case or controversy.

In resolving the pending motions, the Court must examine the record of Plaintiff's past and likely future activity in view of the well established legal standard set forth above. In regard to the past, the record shows that Plaintiff hosted then-President Bill Clinton in 1996, but has not since hosted a single President or active Presidential candidate. In other words, three Presidential election cycles have passed since Plaintiff actually hosted an event that likely would have triggered a bill from the Village under the Ordinance. The last time that Plaintiff hosted former First Lady, then-Senator, later Presidential candidate, and now Secretary of State Hillary

Clinton – in 2005 – the Secret Service did not request any assistance from the Village in connection with security for the event. The closest that Plaintiff has come to hosting an event as to which the Ordinance might have applied was a planned 2008 event for then-Presidential candidate Hillary Clinton, but that event was cancelled. To be sure, Plaintiff has held a number of events involving prominent political candidates and office holders. But he has never received a bill from the Village in connection with any of those events.

And looking ahead to possible future events, the record is unclear at this time as to (i) whether or when Plaintiff will host a Presidential event or event of similar magnitude,[3] (ii) whether the Secret Service would request Village participation in the security arrangements for such an event (should it occur), and/or (iii) whether any such event would be planned sufficiently far in advance for Defendant to advise Plaintiff of the cost of the Village's participation to a reasonable degree of certainty. Indeed, it is not even clear that the Ordinance will remain in place, in its current form, until such time as a future event is scheduled. Nor is it clear that a hypothetical candidate who might be Plaintiff's guest would even permit a local government to provide additional security (beyond Secret Service) without offering or even insisting on reimbursement of the Village's expenses. As Defendant noted in its brief, the record shows that the Republican National Committee footed the bill for President Bush's visit to a Winnetka home in 2004 and, as Defendant points out in its brief, the City of Chicago reportedly was reimbursed

---

[3] Defendant argues on the basis of Plaintiff's deposition testimony that Plaintiff has limited his First Amendment claim to what Defendant calls "presidential events." Plaintiff counters that his claim is not so limited and that the same injury would arise if a United States Senator or Representative or State Governor were to attend an event at Plaintiff's house, so long as the guest of honor had a Secret Service detail, an attachment of Capitol Police, or a comparable level of security protection. For the sake of simplicity, the Court adopts Defendant's term "presidential event," but will use it to encompass any event that would necessitate the use of Village personnel as an adjunct to Secret Service protection or a similar security detail.

by the Democratic National Committee for the services that the City provided in connection with events in Grant Park that were organized by the Obama campaign on Election Night 2008.

Plaintiff asserts that it is "likely, if not inevitable" that he will host a guest whose presence will require Defendant's services. But the record assembled in this case simply does not support such a conclusion. To the contrary, nothing in the record shows a dispute of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune,* 549 U.S. at 127. Rather, Plaintiff's claims "are grounded on contingent future events that may not occur as anticipated, or indeed may not occur at all" (*Corey H.*, 534 F.3d at 689), and Plaintiff certainly has not shown the likelihood of immediate harm that would signal the presence of an actual Article III case or controversy. To the extent that Plaintiff contends that a controversy exists because his First Amendment rights have been "chilled," that position is soundly contradicted by his own statements. Not only has he continued to host events, but Plaintiff even scheduled an event for 2008 Presidential candidate Hillary Clinton – an event that did not take place only because Senator Clinton did not win her party's nomination for President.

If viewed as a standing question, Plaintiff has failed to satisfy his burden of demonstrating that he has suffered an "injury in fact" that is "more than speculative." See *Wisconsin Right to Life, Inc. v. Schober*, 366 F.3d 485, 489 (7th Cir. 2004).[4] Even under the relaxed standing requirements in particular pre-enforcement challenges, a plaintiff still must

---

[4] Judge Pallmeyer's prior ruling that Plaintiff had standing has little relevance to the present dispute because the case has evolved considerably since that ruling was issued. The court previously relied on "an exception to general standing rules [that] arises in the context of the First Amendment subjecting some laws to *facial challenges* even if their application in the case under consideration may not be constitutionally objectionable." *Brandt v. Winnetka*, 2007 WL 844676, *12 (N.D. Ill. Mar. 15, 2007) (emphasis added) (citing *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992); *Sequoia Books, Inc. v. Ingemunson*, 901 F.2d 630, 634 (7th Cir. 1990)). Plaintiff now attacks the Ordinance *as it is applied to him* and therefore no longer can rely on the "special flexibility" accorded to *facial* challenges. See *Sequoia Books, Inc.*, 901 F.2d at 634.

present a specific live grievance. See *J.N.S., Inc. v. State of Indiana*, 712 F.2d 303, 306 (7th Cir. 1983) ("[n]ot every chilling effect of protected expression caused by a general possibility of enforcement creates a justiciable controversy"). Similarly, if examined through a ripeness lens, Plaintiff's claim fails because "[c]ases are unripe when the parties point only to hypothetical, speculative, or illusory disputes as opposed to actual, concrete conflicts." *Hinrichs v. Whitburn*, 975 F.2d 1329, 1333 (7th Cir. 1992). In short, Plaintiff's case must be dismissed for lack of subject matter jurisdiction because the case does not present a justiciable controversy in its current posture.

The Court's decision not to address Plaintiff's claims on justiciability grounds finds additional support in the related and deeply rooted "policy of strict necessity in disposing of constitutional issues" that the Supreme Court has pronounced and lower federal courts must follow. *Rescue Army v. Mun. Court*, 331 U.S. 549, 568 (1947). Indeed, the Supreme Court frequently has commented on "the close connection between the policy of avoiding the premature adjudication of constitutional issues and the limitations on [the courts'] jurisdiction" under Article III. See, *e.g.*, *Minnick v. California Dep't of Corr.*, 452 U.S. 105, 122 n.30 (1981). It is true that case or controversy requirements sometimes are relaxed where First Amendment rights are at stake. See, *e.g.*, *Vernon Beigay, Inc. v. Traxler*, 790 F.2d 1088, 1091 n.1 (4th Cir. 1986)). But even in the area of "free speech jurisprudence," courts must "acknowledge the basic limits on our jurisdiction in the constitutional scheme," pursuant to which a claim "is not fit for adjudication" when the record provides "no factual assurance that future injury is likely." *Elend v. Basham*, 471 F.3d 1199, 1211-12 (11th Cir. 2006).

Moreover, within the realm of the First Amendment, where the plaintiff raises an "as-applied" challenge, it is all the more imperative that the case present a "concrete fact situation in

which competing associational and governmental interests can be weighed." *Elend*, 471 F.3d at 1211. As one of the leading commentators on federal jurisdiction has explained, "specific facts stimulate more comprehensive and accurate adjudication than the flights of fancy. The concrete circumstances presented by a plaintiff who has suffered actual injury may illuminate the abstract issues, and help establish the limits of the decision for future cases." 13 Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 3531.3 (3d ed. 2000).

In sum, the record in support of Plaintiff's contention that a live case or controversy exists falls well short of the mark when examined against the controlling legal standards governing this Court's Article III jurisdiction. Accordingly, Defendant's motion for summary judgment on justiciability grounds [88] must be granted, Plaintiff's cross-motion for summary judgment [85] must be denied, and the case must be dismissed for lack of subject matter jurisdiction under Article III of the federal Constitution.

## IV. Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment [85] is denied, Defendant's motion for summary judgment [88] is granted, and this case is dismissed for lack of subject matter jurisdiction under Article III of the Constitution of the United States.

Dated: September 30, 2009                 _____
                                          Robert M. Dow, Jr.
                                          United States District Judge